No. 81,342

MICHAEL LINDSEY, *Appellant,* v. MIAMI COUNTY NATIONAL
BANK, *Appellee.*
(984 P.2d 719)

Opinion filed July 9, 1999.

*Michael E. Riling*, of Riling, Burkhead, & Nitcher, Chartered, of Lawrence, argued the case and was on the brief for appellant.

*Carl W. Hartley*, of Hartley, Nicholson, Hartley & Arnett, P.A., argued the cause, and *Debra J. Arnett*, of the same firm, was with him on the brief for appellee.

The opinion of the court was delivered by

LARSON, J.: Michael Lindsey appeals the trial court's denial of his claim for punitive damages in his suit against the Miami County National Bank (Bank) for conversion after a Bank employee wrongfully took Lindsey's car, believing it to be one in which the Bank had a security interest.

Lindsey was awarded actual damages of $5,500 after a jury trial and now contends (1) a prima facie case is made for punitive damages when a secured creditor, while exercising a self-help repossession, takes property it has no security interest in, (2) the Bank is responsible for punitive damages for the reckless actions of its vice-president, and (3) the trial court abused its discretion in refusing Lindsey's motion to amend his petition to include a punitive damages claim.

The facts as considered by the trial court drove its decision as well as our review on appeal and will be set forth in detail.

In late summer 1996, Todd Norton, a consumer loan officer at the Bank's Paola branch office, asked Steve Beyer, a vice-president and manager of the Bank's DeSoto branch, to repossess Cheryl Johnston's 1983 Datsun 280ZX that was located in Lawrence and was the collateral for a delinquent loan. The repossession was to depend on the condition of the car, and Beyer was asked to visit Johnston, inspect the vehicle, and see if it was worth the cost of repossession and preparation for sale. Beyer was given Johnston's address as well as the make and model of the vehicle. Beyer stated he was not sure if he was told the year or Vehicle Identification Number (VIN) of the Johnston vehicle.

Beyer located Johnston's apartment but not Johnston. However, in a parking lot adjacent to and about 100 feet away, Beyer spotted a faded red Datsun. The vehicle appeared to be abandoned, and

Beyer assumed it to be Johnston's, although contrary to the Bank's standard bank policy, he failed to check the VIN.

The vehicle was actually Lindsey's 1977 Datsun 280Z that was parked in the same corner of the lot each day in order for Lindsey to participate in the State van pool.

Beyer phoned Norton to tell him the vehicle had been located but that a dealer's opinion was needed to ascertain value. After obtaining an opinion from Right Way Motors regarding value and repair costs, Beyer and Norton agreed the Bank should proceed with repossession.

Beyer contacted Leonard Paxton, a tow truck operator in De-Soto who had assisted the bank previously. He gave Paxton the color, make, and model, and described the vehicle which he asked to be towed to Right Way Motors. Although Beyer usually gave the VIN to those he hired to aid in repossessions, it was not given or asked for on this occasion. The car was towed on August 26, 1996.

When Lindsey returned from work that evening, he found his vehicle missing. He called the police and reported it stolen. He later leased a vehicle.

The Bank gave Johnston notice of the repossession but received no response. Right Way Motors spent $225 in repairs and improvements to prepare the vehicle for sale. The Bank processed the documents necessary to obtain a certificate of title using the vehicle description from the Johnston file.

Right Way Motors found a buyer, and the sale was about to be concluded on October 1 when the buyer discovered the year stamped on the hood was 1977 rather than 1983. When the Bank was notified of the discrepancy, it checked the VIN and found it did not match Johnston's.

Using papers retrieved from the vehicle, Beyer identified Lindsey as the owner and contacted him about the error. Beyer also informed his supervisor, Mary Ellen Gihlcrist, who is the Bank's senior vice president in charge of retail banking and the supervisor for all branch managers. On October 4, 1996, Beyer personally returned the vehicle to Lindsey, explained the mistake, and apologized to him.

Lindsey subsequently sued the Bank alleging conversion and the tort of outrage, which was later abandoned. Prior to the pretrial conference, Lindsey moved to amend his petition to include a claim of punitive damages, alleging conversion was an intentional act for which punitive damages were available under Kansas law. Lindsey's affidavit set forth the facts we have stated previously.

The Bank's response included two affidavits, one from Beyer describing the events leading to the repossession and one from Neil Blakeman, the Bank's executive vice president and senior lending officer, noting Beyer's violation of the Bank's repossession policies.

Lindsey's memorandum in support of his motion argued punitive damages should be allowable because (1) Beyer was a management level employee who had violated the Bank's repossession policies, (2) the Bank had ratified Beyer's wrongful actions by keeping the vehicle for more than a month, and (3) the Bank was grossly negligent in failing to require that at least one person other than Beyer verify the VIN.

The trial court issued a written order denying Lindsey's motion. It concluded that under *Smith v. Printup*, 254 Kan. 315, 866 P.2d 985 (1995), which interpreted 60-3702(d), the Bank could only be liable for punitive damages for Beyer's wrongful conduct if it authorized or ratified that conduct. Because Beyer failed to check the VIN, he did not follow standard bank procedure, and his conduct was not authorized.

The court further noted that punitive damages are intended to punish wrongdoers for a malicious, willful, fraudulent, or wanton invasion of another's right and to deter similar future conduct. K.S.A. 60-3702(c); *Rios v. Bigler*, 847 F. Supp. 1538, 1548 (D. Kan. 1994). The trial court opined there was no evidence of malicious intent, as Beyer simply negligently repossessed the wrong car.

The trial court further stated there was no evidence this sort of situation was a frequent occurrence or had ever happened previously at the Bank.

Finally, the trial court discounted Lindsey's reliance on *Gould v. Taco Bell*, 239 Kan. 564, 571-573, 722 P.2d 511 (1986), where punitive damages were allowed for wanton conduct when a manager refused to intervene or even call police when two patrons were

being beaten. The trial court held that the level of wrongful conduct in *Gould* was clearly greater than is present here. The trial court held there was no reckless indifference of consequences here, with the employee's actions being nothing more than negligence.

After the jury trial, Lindsey appealed, as we have previously stated.

Under the Kansas procedure set forth in K.S.A. 60-3703, a plaintiff must apply to the trial court for permission to amend the petition to include a claim for punitive damages. A plaintiff must show there is a probability that he or she will prevail on the claim. "Probability" was defined in *Fusaro v. First Family Mtg. Corp.*, 257 Kan. 794, 801, 897 P.2d 123 (1995), as meaning "more likely than not."

In deciding whether to allow a claim for punitive damages, a trial court must consider the plaintiff's burden at trial is by "clear and convincing evidence, . . . that the defendant acted toward the plaintiff with willful conduct, wanton conduct, fraud or malice." K.S.A. 60-3702(c). The evidence is to be considered in the light most favorable to the moving party, leaving credibility determinations, weighing of evidence, and the drawing of legitimate inferences to the jury. *Fusaro*, 257 Kan. at 802.

In *Fusaro*, 257 Kan. at 804, we discussed the appropriate standard of review when a plaintiff challenges the trial court's decision not to allow an amendment for punitive damages:

"Under K.S.A. 60-3703, the decision whether to permit plaintiff to amend is discretionary in that the statute provides that the court *may* allow the filing of an amended petition claiming punitive damages. Thus, our standard of review is one of abuse of discretion. " 'Judicial discretion is abused when judicial action is arbitrary, fanciful or unreasonable, which is another way of saying that discretion is abused only where no reasonable [person] would take the view adopted by the trial court.' " *In re Marriage of Cray*, 254 Kan. 376, 387, 867 P.2d 291 (1994) (quoting *Stayton v. Stayton*, 211 Kan. 560, 562, 506 P.2d 1172 [1973])."

To the extent the trial court's decision rests on preliminary findings of fact, it is this court's responsibility to determine whether the trial court's findings are supported by substantial competent evidence. See *Fusaro*, 257 Kan. at 804. This court's review of any of

the trial court's conclusions of law, however, is unlimited. See *Gillespie v. Seymour*, 250 Kan. 123, 129, 823 P.2d 782 (1991).

Lindsey's first argument, that a prima facie case for punitive damages exists whenever a self-help repossession involves the taking of property in which the repossessor had no security interest, was not directly made to the trial court and is subject to our rule that new legal theories and issues not raised before the trial court cannot be raised for the first time on appeal. *Ripley v. Tolbert*, 260 Kan. 491, Syl. ¶ 6, 921 P.2d 1210 (1996); *Bolyard v. Kansas Dept. of SRS*, 259 Kan. 447, Syl. ¶ 8, 912 P.2d 729 (1996).

The statutory and case law argument Lindsey makes concerning avoidance of breaching of the peace during self-help repossession is not appropriate here. See *Wade v. Ford Motor Credit Co.*, 8 Kan. App. 2d 737, 741-46, 668 P.2d 183, *rev. denied* 234 Kan. 1078 (1983). This argument asks us to contravene the legislature's expressed intention that trial courts exercise their discretion under the facts of each case as allowed and required by K.S.A. 60-3703. The remedy for this argument is with the legislature, not the courts.

The next argument that Lindsey makes is that an employer is automatically liable for punitive damages under K.S.A. 60-3702 for the reckless actions of a management level employee.

The provisions of K.S.A. 60-3702(d) that are applicable to this case state:

"(d) In no case shall exemplary or punitive damages be assessed pursuant to this section against:

(1) A principal or employer for the acts of an agent or employee unless the questioned conduct was authorized or ratified by a person expressly empowered to do so on behalf of the principal or employer; or

(2) an association, partnership or corporation for the acts of a member, partner or shareholder unless such association, partnership or corporation authorized or ratified the questioned conduct."

Prior to the enactment of K.S.A. 60-3701 and K.S.A. 60-3702, this court, in *Kline v. Multi-Media Cablevision, Inc.*, 233 Kan. 988, Syl. ¶ 4, 666 P.2d 711 (1983), had held that an employer or corporation could be liable for punitive damages due to an employee's or managerial agent's tortious conduct committed in the course of employment where:

"(a) a corporation or its managerial agent authorized the doing and manner of the act; (b) the employee was unfit and the corporation or its managerial agent was reckless in employing or retaining him; (c) the employee was employed in a managerial capacity and was acting within the scope of employment; or (d) the corporation or its managerial agent ratified or approved the act of the employee." 233 Kan. 988, Syl. ¶ 4.

However, as noted by this court in *Smith v. Printup, Kline's* four-part rule was constricted by K.S.A. 60-3701 and K.S.A. 60-3702. These later statutory enactments expressly limit the factual situations in which an employer can be liable for punitive damages for the tortious conduct of its employees to those circumstances essentially described in (a) (authorization) and (d) (ratification) of the *Kline* scenarios. *Smith*, 254 Kan. at 336-37.

In the trial court, Lindsey relied on the holding of *Gould*, 239 Kan. at 571-573, where the defendant company was held responsible for the wanton actions of a manager of one of its restaurants. However, *Gould* was decided prior to the enactments of K.S.A. 60-3701 and K.S.A. 60-3702, and liability in *Gould* was expressly based on scenario (c) of the *Kline* opinion which, as noted above, was *not* adopted by the legislature.

Nonetheless, Lindsey argues Beyer had full authority over repossessions and the right to conduct them without supervision or direct guidelines, making him more a principal than an employee or agent, resulting in the Bank being directly accountable for his actions.

Although Beyer did have authority to proceed with repossessions without securing the prior approval of Gihlcrist, his supervisor, he did not have carte blanche authority to conduct repossession in any manner he chose or to disregard the Bank's repossession policies, which were well established.

The evidence and affidavits showed the Bank used three methods of repossession: (1) voluntary surrender of the property; (2) utilizing a property recovery agency to locate and repossess the property for the Bank; and (3) repossession by a Bank employee, with a tow truck driver utilized in case of a vehicle.

In each case, the Bank has had a longstanding rule to identify vehicles for repossession using the VIN, make, model, and any

other descriptive information available in the pertinent loan file. The VIN is the most critical piece of information, and the Bank policy required it to be checked both prior to and after the repossession. Where a Bank employee conducted a repossession under method (3), that employee would be the one responsible for verification of the VIN.

Although the Bank's repossession policies were not in writing, they were conveyed orally to loan agents during their training in repossessions and were also discussed at branch manager meetings throughout the year. Beyer had been trained in the Bank's repossession policies and practices, and he knew he was supposed to check the VIN of the Johnston vehicle both before and after repossessing it.

Beyer's failure to follow the Bank's procedure had been noted in his personnel file, and Gihlcrist reviewed the procedure with Beyer after the car was returned. Beyer admitted the procedures reviewed with him were the same ones in which he had been trained.

What Lindsey essentially seeks is to resurrect circumstance (c) from *Kline* that "the employee was employed in a managerial capacity and was acting within the scope of employment," 233 Kan. 988, Syl. ¶ 4, despite the legislature's clear removal of this broad area in which employers can be liable for punitive damages for their employees' wrongful acts. Lindsey's argument on this contention is again, one to be made to the legislature, not to the courts.

Lindsey also failed to show that the Bank had authorized or ratified Beyer's actions. Authorization and ratification were discussed in *Smith*, 254 Kan. at 342. Authorization is generally accomplished before or during the employee's questioned conduct and may be based on an express grant of authority or on a course of conduct implying authority. Ratification is more likely accomplished during or after the questioned conduct and may be express or implied.

The statute's requirement that "the questioned conduct [be] authorized or ratified by a person expressly empowered to do so on behalf of the principal or employer," K.S.A. 60-3702(d)(1), would require that someone like Gihlcrist or Blakeman knew of Beyer's

improper actions and condoned them. It is clear that neither person authorized or ratified Beyer's improper actions. There is no evidence Beyer had failed to examine the VIN or repossessed the wrong vehicle in any other instance or that any kind of implied authorization existed for him to do so in this case. Nor is there evidence of ratification, as the vehicle was immediately returned once the error was known. There is no clear and convincing evidence of either authorization or ratification.

Lindsey finally argues the trial court abused its discretion under K.S.A. 60-3703 in refusing to grant his motion to include a claim for punitive damages.

This argument restates the facts and contends the collective acts and omissions by Beyer manifest a wanton indifference of Lindsey's rights which merit punishment. The authorities cited for this argument were all decided prior to the adoption of K.S.A. 60-3701 *et seq.*, and are not applicable to our case.

Regardless of the spin Lindsey puts on the facts, he has failed to demonstrate the Bank's liability for punitive damages through authorization or ratification under K.S.A. 60-3701; nor do the acts and omissions establish wanton conduct.

We will not repeat everything we have previously stated, but the Bank did have clearly established policies to guard against wrongful repossession. The fact a second individual was not required to reverify the VIN after repossession was not wanton conduct. The time of wrongful possession may have exceeded 30 days, but that in and of itself does not establish wanton conduct.

Under our standard of review, we hold the trial court did not abuse its discretion in its finding that wantonness did not exist. Additionally, the trial court did not abuse its discretion in refusing to grant Lindsey's motion to amend his petition to include a claim for punitive damages.

Affirmed.