**COMMERCE BANK, N.A., Plaintiff,**

v.

**CHRYSLER REALTY CORPORATION and DaimlerChrysler Corporation, Defendants.**

**Civil Action No. 99–2017–KHV.**

United States District Court, D. Kansas.

Dec. 7, 1999.

James P. O'Hara, Andrew M.DeMarea, Shughart, Thomson & Kilroy, Overland Park, KS, for plaintiff.

Stephen M. Ryan, Michael J. Gorman, Daniels & Kaplan, P.C., Kansas City, MO, Kirkland W. Garey, Michael G. Cruse, Howard & Howard, P.C., Bloomfield Hills, MI, for defendants.

## MEMORANDUM AND ORDER

VRATIL, District Judge.

Commerce Bank, N.A. brings suit against Chrysler Realty Corporation and DaimlerChrysler Corporation, alleging that they converted collateral in which the bank had a perfected security interest. On cross-motions for summary judgment, the Court found as a matter of law that defendants had converted the bank's right to $218,000.00 in which it held a perfected security interest. *See Memorandum and Order* (Doc. # 46) filed October 14, 1999; *Defendants' Motion for Summary Judgment* (Doc. # 31) and *Plaintiff's Motion For Summary Judgment* (Doc. # 33), both filed August 6, 1999. The Court also found that the summary judgment record presented a factual question whether Commerce was entitled to punitive damages.

On November 30, 1999, the Court tried the one remaining issue in the case—that of punitive damages. Having considered the evidence presented at trial, the Court makes the following findings of fact and conclusions of law pursuant to Rule 52(a), Federal Rules of Civil Procedure.

## FINDINGS OF FACT[1]

Commerce Bank, N.A. (Commerce) is a national banking association. Daimler-Chrysler Corporation (Chrysler) is an automobile manufacturer. Prior to its merger with Daimler–Benz, AG, Chrysler was known as Chrysler Corporation. Chrysler Realty Corporation (CRC) acquires, develops, leases and sells various real estate assets which are related to the marketing functions of Chrysler. CRC is an affiliate of Chrysler.

On September 5, 1991, Chrysler and one of its retail dealers, Bierwirth Chrysler Plymouth, Inc. (Bierwirth) entered into a Sales and Service Agreement (the Dealer Agreement). The Dealer Agreement provided that Chrysler could apply to any amount which Bierwirth owed any Chrysler affiliate (such as CRC) any credit which Chrysler owed Bierwirth. The agreement also provided that if Bierwirth were to assign to a third party any credits owing from Chrysler, Bierwirth would first notify the third party of Chrysler's "first priority rights" to such credits.

On October 10, 1995, CRC (as landlord) and Bierwirth (as tenant) executed a Dealer Lease Agreement regarding the premises of the Bierwirth dealership. The lease provided that to ensure the payment of monies due CRC, Bierwirth assigned to CRC all credits due or to become due from Chrysler. The lease also gave CRC the right to receive and collect any monies due Bierwirth from Chrysler. The lease required CRC to apply such funds to rent and other sums and charges due under the lease and to pay CRC's costs and expenses in exercising and continuing the assignments, including attorney fees in connection therewith. Any remaining sums were to be paid over to Bierwirth.

Bierwirth agreed that CRC's right of assignment under the lease would constitute a security interest under the Uniform Commercial Code as applicable in Kansas.

---

**1.** The parties agree that most of the facts are uncontroverted. *See Stipulation* (Doc. # 37) filed August 6, 1999.

Bierwirth also agreed that it would not transfer any interest in such accounts that would create an interest paramount to that of CRC, and that the breach of such obligation would constitute a default under the lease. CRC did not file a financing statement concerning the security interest referred to in the lease.

Two months after Bierwirth executed the lease and assignment to CRC, Bierwirth executed and delivered to Commerce a Security Agreement (the 1995 Security Agreement) pursuant to which Commerce provided inventory floor plan financing to Bierwirth. In the agreement, which is dated December 8, 1995, Bierwirth granted Commerce a security interest in all inventory, accounts receivable, contract rights and general intangibles then existing or thereafter owing to Bierwirth. On December 22, 1995, Commerce perfected its security interest in the collateral by filing UCC–1 financing statements with the Kansas Secretary of State. *See, e.g.,* Stipulation, Exhibit 4.

Some three years later, on February 4, 1998, Bierwirth executed and delivered to Commerce a second Security Agreement (the 1998 Security Agreement). *See* Stipulation, Exhibit 5. Pursuant to this agreement, Bierwirth granted Commerce a security interest in all contract rights, accounts receivable, and general intangibles of Bierwirth, whether then owned or thereafter acquired, and all proceeds of same. On February 5, 1998, Commerce perfected its security interest in this collateral by filing UCC–1 financing statements with the Kansas Secretary of State.

On January 14, 1998, CRC sent Chrysler written notice that Bierwirth had assigned to CRC the factory receivables which were due Bierwirth from Chrysler. Bierwirth's factory receivables included a variety of credits from Chrysler for (among other things) sales promotion incentives, warranty work and returned parts. The CRC notice stated that the assignment had been lodged because Bierwirth was $34,165.84 in arrears for rent due for December of 1997 and January of 1998. CRC requested that the factory monies be paid directly to CRC until further notice. In response, Chrysler sent CRC four checks for factory receivables, in the total amount of $218,000.00. Commerce claims a perfected security interest in those funds.

On December 16, 1997, Bierwirth agreed to sell its assets to Thomas P. Doherty on February 3, 1998. On January 26, 1998, CRC sent Bierwirth a letter which demanded that Bierwirth make certain repairs to the dealership premises. CRC ultimately paid $196,000.00 to make the repairs on behalf of Bierwirth. On February 3, 1998, CRC and Bierwirth terminated the lease on account of Bierwirth's default.

On May 6, 1998, Commerce faxed a letter to Chrysler, asserting that it had a perfected security interest in the factory receivables which Chrysler owed to Bierwirth. Commerce also faxed copies of the 1995 and 1998 Security Agreements and related financing statements. Commerce requested that Chrysler remit $100,-308.24.[2] *See* Stipulation, Exhibit 14. When it received this letter, Chrysler had already paid $209,000.00 to CRC by monthly checks dated February 24, March 24, and April 24, 1998. On May 11, 1998, Chrysler responded to Commerce's letter of May 6, 1998, stating that CRC had filed an assignment on January 15, 1998, "thereby preceding [Commerce's] action." *See* Stipulation, Exhibit 15. Chrysler stated that it would make payments to Commerce only upon release of CRC's assignment.

On May 14, 1998, Commerce faxed a letter to Chrysler, with a carbon copy to CRC, complaining that its interests in the factory receivables had been converted. Commerce requested pertinent documentation and an accounting by Chrysler and

2. The $100,308.24 figure corresponds to the amount indicated on Chrysler's March 31, 1998, dealer statement for Bierwirth.

CFC. Shortly thereafter, Chrysler sent CRC a final check for $13,000.00. *See* Stipulation, Exhibit 8. A few days later, on May 20, 1998, CRC sent Chrysler a letter which removed Bierwirth from "factory assignment." *See* Stipulation, Exhibit 17.

On May 21, 1998, Chrysler faxed Commerce a letter, with copies to CRC, which stated that Chrysler had not converted any funds. On June 11, 1998, Commerce faxed a response which renewed and made more specific its requests for an accounting and related information. The letter requested a copy of the assignment which CRC had allegedly filed on January 15, 1998, and copies of all documents that related or referred to where and how said assignment was "filed." Stipulation, Exhibit 19.

Chrysler paid CRC some $2,000.00 more than CRC was entitled to claim from Bierwirth. Although Commerce filed suit on January 15, 1999, CRC did not notify Chrysler, Bierwirth or Commerce of the surplusage. In fact, CRC did not disclose this information until the deposition of Thomas H. Noles, CRC Eastern Area Manager, on May 17, 1999. Mr. Noles testified as follows about the $2,000.00 surplusage:

Q. [. . .] Why are you holding onto the money?

A. Because there is a lawsuit. I will settle it when the lawsuit is settled.

Q. So, you will hold it as long as you can?

A. Nobody has asked me to give it to them. I would be happy to give it to anybody that deserves it.

Q. I want to be clear about it. This was a conscious decision that you, as the Area Manager of Chrysler Realty, have made, correct?

A. I don't know how conscious it is. I have excess monies, you know, and I didn't know on May 14th that I had excess monies, but since the lawsuit I have been aware that I have excess monies and I figure when the lawsuit is settled, then, yeah, we will give it to you. I don't know who to give it to.

Q. You never asked, correct?

A. No.

Q. My statement is correct?

A. What is your statement?

Q. You have never asked about giving the money back? It has never been tendered?

A. No.

Q. You would agree with me that there is no basis of any kind for Chrysler Realty to be retaining that money, would that be fair?

A. I think that is fair.

Q. Do you think that it is fair that you retain it or that my statement is fair?

A. I think that your statement is fair.

Q. Would you agree with me, that as best you know, at least, there is no basis on which Chrysler Corporation could claim that money, correct?

A. I don't know about Chrysler Corporation. Chrysler Realty has no basis.

Q. Well, Chrysler Corporation hasn't told you, at least, that they have any reason to claim that money, correct?

A. No.

Q. And Chrysler Financial Corporation, your parent company, or the parent company to Chrysler Realty, hasn't asserted any claim to that $2,000 surplusage?

A. Not that I'm aware.

Noles Depo. at. 62, 1. 21–64, 1. 15.

The conduct of Mr. Noles in failing to return the $2,000.00 surplus displayed an attitude of conscious disregard for the legal rights of plaintiff. In addition, because defendants refused to provide Commerce an accounting, one may reasonably infer that Mr. Noles intentionally concealed the $2,000.00 surplus throughout the litigation, until his deposition. Further, although the record does not contain any evidence that defendants expressly ratified the conduct of Mr. Noles, he is the Eastern Manager of CRC and reports to Dana Coventry, the CRC Director—Managing Properties and Facilities, who in turn reports to CRC

President Joe Shady. The Court infers from this evidence that Mr. Noles had the authority to act on behalf of CRC in this matter.

At trial, the Court received testimony from defendants' former attorney in this matter, Michael Cruse. Mr. Cruse testified that after the Noles deposition, he discussed the $2,000.00 surplus with plaintiff's attorney, James O'Hara. Mr. Cruse testified that he had not known about the money, but that he offered to tender it to plaintiff. According to Mr. Cruse, Mr. O'Hara responded that he wanted to think about it. Mr. Cruse stated that he told Mr. O'Hara to "let [him] know," but that he heard nothing further from Mr. O'Hara. Defendants did not tender the funds or make a written offer to do so.

The parties have stipulated that throughout this matter, Chrysler proceeded in reliance on the assumption that CRC would act honestly and in good faith and remit any surplusage for the benefit of Bierwirth or Commerce, its assignee. The record contains no direct evidence that Chrysler was aware of the surplus.

CRC's highest annual gross income for the years 1993–1997 was $122.4 million. Chrysler's highest annual gross income for the period 1993–1997 was $61,397 million.

Neither party presented evidence whether CRC or Chrysler have changed any policies or procedures as a result of the deterrent effect of this litigation. Nor have they suggested that other damages and punishment have been imposed in prior cases. Commerce has incurred approximately $66,378.33 in legal fees in pursing this litigation.

In granting Commerce summary judgment on the issue of conversion, the Court found that as a matter of law, the bank's perfected security interest took priority over Chrysler's asserted right to remit to CRC any credits which Chrysler owed Bierwirth. That legal question required the Court to interpret the Kansas Uniform Commercial Code, based on a reading of Kansas law and persuasive authority from other jurisdictions. Defendants took the position that under K.S.A. § 84–9–318(1), plaintiff's rights as an assignee were subject to the agreements between Chrysler and Bierwirth and "any defense or claim arising therefrom," and that the bank's security interest was therefore subject to Chrysler's right to remit to CRC any credits which Chrysler owed Bierwirth. Although the Court ultimately rejected their position, defendants did not unreasonably interpret the U.C.C. or existing case law. Thus, although the Court ultimately found that defendants had converted $216,000.00 in accounts receivable, it finds that they retained those funds in good faith and with a commercially reasonable basis for doing so.

### CONCLUSIONS OF LAW

"In Kansas, punitive damages are awarded to punish the wrongdoer for his malicious, vindictive, or willful and wanton invasion of another's rights, with the ultimate purpose being to restrain and deter others from the commission of similar wrongs." *Golconda Screw, Inc. v. West Bottoms Ltd.,* 20 Kan.App.2d 1002, 1007, 894 P.2d 260, 265 (1995) (quotations omitted); *Mohr v. State Bank of Stanley,* 241 Kan. 42, 56–57, 734 P.2d 1071, 1082 (1987) (conversion of checks where corporate officer deposited proceeds in personal account; though bank was negligent record contained no evidence that bank engaged in vindictive conduct, intentional wrongdoing, or wanton invasion of rights of plaintiff; thus award of punitive damages was reversed).

Kansas law provides that to recover punitive damages, plaintiff must prove by clear and convincing evidence that defendant acted with willful conduct, wanton conduct, fraud or malice. K.S.A. § 60–3701(c). Punitive damages may not be assessed against a principal or employer for the acts of an agent or employee unless the questioned conduct was authorized or ratified by a person expressly empowered to do so on behalf of the principal or employer. K.S.A. §§ 60–3701(b), 3702(b).

■ Commerce asserts that the evidence in this case supports a finding of wanton if not willful conduct by defendants. Under Kansas law, an act is wanton if it is performed with a realization of the imminence of danger and a reckless disregard or complete indifference to the probable consequences. *See Powell v. Havner,* 817 F.Supp. 90 (D.Kan.1993).

■ Commerce asserts that two particular facts show wanton conduct by defendants. First, after Commerce informed defendants of its perfected security interest and its concern that collateral was being converted, Chrysler transferred the final $13,000.00 in factory receivables to CRC and CRC retained those funds. Defendants reply that in doing so, they relied on their contractual rights. The Court finds that defendants' argument on this issue is well taken. As noted above, although the Court resolved against defendants the question of conversion, the application of the U.C.C. to these facts involved an unsettled question of law. The Court therefore concludes that defendants' failure to return the $13,000.00 in accounts receivable was not wanton conduct under Kansas law. No punitive award is justified for that conduct.

■ Commerce also points out that CRC retained approximately $2,000.00 more from Chrysler than Bierwirth ever owed CRC. Defendants counter that Mr. Cruse offered to remit the excess to Commerce but the bank's attorney rejected the offer. The Court concludes that Mr. Noles willfully retained the surplus funds, however, with knowledge that CRC had no legal right to the funds. Although defendants argue that they did not ratify the conduct of Mr. Noles, the record establishes that as area manager for CRC, he had express or implied authority to manage and dispose of the funds. Therefore plaintiff need not show that CRC ratified his conduct. *Cf. Lindsey v. Miami County Nat'l. Bank,* 267 Kan. 685, 692, 984 P.2d 719, 724 (1999) (actions of employee which violated employer's policy and procedure were not authorized or ratified by employer). On the other hand, the facts do not lead the Court to conclude that Mr. Noles had authority to act for Chrysler. Further, plaintiff cites no evidence that Chrysler condoned the conduct of Mr. Noles, or even knew about it before his deposition. Even after Chrysler acquired actual or constructive knowledge through the deposition testimony of Mr. Noles, however, it apparently did not ask CRC to remit the $2,000.00 surplus to either Bierwirth or plaintiff. While such a gesture would clearly have been appropriate, the Court cannot find that Chrysler acted wantonly or willfully in the circumstances.

■ The Court does conclude, however, that CRC through Mr. Noles acted wantonly in retaining the $2,000.00 surplus. This action justifies an award of punitive damages. In cases in which exemplary or punitive damages are recoverable, the Court may consider in determining the amount of punitive damages to be awarded:

(1) The likelihood at the time of the alleged misconduct that serious harm would arise from the defendant's misconduct;

(2) the degree of the defendant's awareness of that likelihood;

(3) the profitability of the defendant's misconduct;

(4) the duration of the misconduct and any intentional concealment of it;

(5) the attitude and conduct of the defendant upon discovery of the misconduct;

(6) the financial condition of the defendant; and

(7) the total deterrent effect of other damages and punishment imposed upon the defendant as a result of the misconduct, including, but not limited to, compensatory, exemplary and punitive damage awards to persons in situations similar to those of the claimant and the severity of the criminal penalties to which the defendant has been or may be subjected.

K.S.A. §§ 60–3701(b), 3702(b). The Court considers each factor in turn.

The first two factors—the likelihood at the time of the alleged misconduct that serious harm would arise from the defendant's misconduct, and the degree of the defendant's awareness of that likelihood—weigh against a substantial award of punitive damages. The likelihood of serious harm from defendant's wrongful retention of the $2,000.00, and thus CRC's awareness of that harm, are both extremely low. The profitability of the misconduct also weighs against a substantial award of punitive damages. Although plaintiff argues that the $2,000.00 was "pure profit," the amount of that profit compared with the net worth of CRC weighs against a significant award.

As for the duration of the misconduct and any intentional concealment of it, the Court notes that CRC retained the $2,000.00 over the course of this litigation, but that the evidence of intentional concealment is not particularly strong. CRC's attitude and conduct upon discovery of the misconduct, however, is troublesome. Even after Mr. Noles stated in his deposition that the money was surplusage, CRC did not tender it to Commerce. CRC knew that it did not rightfully hold the funds, but it determined not to return them unless and until forced to do so by court order or settlement of the larger issues between the parties. Although CRC asserted at trial that it retained the funds because it might have been entitled to attorneys' fees under the lease agreement, that argument is frivolous. CRC produced no evidence that Mr. Noles retained the funds for that reason, or that he had any legal right to withhold such funds as security for a future award of attorneys' fees. CRC's attitude and conduct upon discovery of the misconduct suggests a higher award of punitive damages.

The next factor, CRC's financial condition, also weighs in favor of a significant punitive damage award. CRC's highest annual gross income for the years 1993–1997 was $122.4 million. As a substantial company, it had no colorable excuse for retaining $2,000.00 to which it had no legal right whatsoever. The final factor is the total deterrent effect of other damages and punishment imposed upon defendant as a result of the misconduct. As defendants point out, however, neither party has presented any evidence as to this factor.

The Court has considered all of these factors in arriving at an amount of punitive damages which will be sufficient to punish CRC for its wrongful conduct and deter it and others from similar misconduct in the future. The Court believes that the sum of $20,000.00 is a sufficient award to accomplish these ends. It is ten times the amount which CRC wantonly or willfully withheld. While it does not make plaintiff whole for its litigation expenses, as plaintiff requested, the bulk of this case involved a novel question of law. While the number may not seem high in proportion to CRC's gross revenues, it places a reasonable price tag on the conduct in which CRC engaged.[3]

---

**3.** The Court acknowledges that the amount of punitive damages is also subject to the following statutory limitations under K.S.A. § 60–3701:

(e) Except as provided by subsection (f), no award of exemplary or punitive damages pursuant to this section shall exceed the lesser of:
(1) The annual gross income earned by the defendant, as determined by the court based upon the defendant's highest gross annual income earned for any one of the five years immediately before the act for which such damages are awarded; or

(2) $5 million.
(f) In lieu of the limitation provided by subsection (e), if the court finds that the profitability of the defendant's misconduct exceeds or is expected to exceed the limitation of subsection (e), the limitation on the amount of exemplary or punitive damages which the court may award shall be an amount equal to 1½ times the amount of profit which the defendant gained or is expected to gain as a result of the defendant's misconduct.
K.S.A. § 60–3701. The Court's award does not approach any of these limits.

**IT IS THEREFORE ORDERED** that plaintiff is entitled to $20,000.00 in punitive damages for the wanton or willful conduct of Chrysler Realty Corporation. The Clerk is directed to enter judgment for plaintiff and against both defendants in the amount of $218,000.00 actual damages. The Clerk is further directed to enter judgment for plaintiff and against Chrysler Realty Corporation in the amount of $20,-000.00 punitive damages.