No. 86,347

EMPIRE MANUFACTURING COMPANY, n/k/a/ SMTM, INC., and KENT A. MISEMER, individually, and as Trustee under the KENT A. MISEMER REVOCABLE TRUST, dated December 24, 1992, *Appellees*, v. EMPIRE CANDLE, INC., *Appellant*.

(41 P.3d 798)

Opinion filed March 8, 2002.

*Terrence J. Fleming*, of Lindquist & Vennum P.L.L.P., of Minneapolis, Minnesota, argued the cause, and *Kim Ruckdaschel-Haley*, of the same firm, and *Ron Bodinson* and and *Jason Pepe*, of Shook, Hardy, & Bacon L.L.P., of Overland Park, were with him on the briefs for appellant.

*Richard S. Wetzler*, of Holman, Hansen, Colville & Coates, P.C., of Overland Park, argued the cause and was on the brief for appellees.

The opinion of the court was delivered by

ALLEGRUCCI, J.: This is an appeal from the judgment of the district court in a breach of contract action. The defendant, Empire Candle, Inc., (Empire) appeals from a judgment of $1,200,000 entered in favor of the plaintiff, Empire Manufacturing Company (Misemer).

Empire argues on appeal that the district court erred: (1) in awarding Misemer $1,200,000 in damages; (2) in concluding that Empire committed an anticipatory breach of contract; and (3) in granting the temporary restraining order.

The parties tried this case to the district court, which took the matter under advisement and later issued a journal entry/memo-

randum decision. The journal entry contains findings of fact in numbered paragraphs, which Empire has not appealed from. Thus, the trial court's determinations of fact are final and conclusive. *Klose v. Wood Valley Racquet Club, Inc.*, 267 Kan. 164, 975 P.2d 1218 (1999).

The district court's findings of fact, with the names we are calling the parties substituted for the terms, plaintiffs and defendant, are as follows:

"1. Plaintiff Kent Misemer was the owner of a company known as Empire Manufacturing Company from August of 1991 to February of 1997. The company engaged in the manufacturing and sale of candles and related products.

"2. On February 28, 1997, Misemer sold the assets of his company to defendant [Empire Candle] which was a wholly owned subsidiary of a company called Diamond Brands Incorporated, for approximately $26,000,000. Part of the assets included inventory worth approximately $7,500,000 half of which consisted of raw materials and half of finished goods.

"3. The sales contract contained the following clause which is the subject of the dispute in this case:

'10.03 **Obsolete Inventory; Disposal**. If, on the first anniversary of the Closing Date, there remains any Inventory which also existed on the Closing Date, then buyer must, within 10 business days of that first anniversary, determine the book value of that remaining Inventory and deliver a written copy of that determination (including a reasonable amount of detail to support that determination) to Seller and Shareholder. Within 5 days of Seller's and shareholder's receipt of that written determination, Seller and Shareholder, jointly and severally, must pay to Buyer the book value of that remaining Inventory. **Buyer must dispose of that remaining Inventory in accordance with the past practices of Seller regarding the disposal of obsolete or slow-moving Inventory.** Each month following the first anniversary of the Closing Date until all of the remaining Inventory has been disposed of, Buyer must remit to Seller and Shareholder any consideration received by Buyer from the disposal of that Inventory, less Buyer's direct cost of such disposal. In the event Buyer's direct cost of disposal exceeds the amount of consideration received by Buyer for the disposal of the Inventory, Seller and Shareholder, jointly and severally, must promptly remit an amount equal to such excess. Buyer agrees to use all reasonable efforts during the 12-month period following the Closing Date to continue marketing all inventory items which buyer purchased from Seller if those types of items were sold by Seller during 1996. Buyer will also use all reasonable efforts to sell (provided the items are salable) those inventory items which Buyer purchased from Seller before selling any products which are produced after the Closing Date and which are exactly the same types of products as the existing inventory.'

"4. The uncontradicted evidence of Misemer establishes clearly what their past practices consisted of regarding the disposal of inventory more than one year old. They would continue to market product at national shows and sales meetings at a discount and to solicit orders for which it would convert raw materials into finished goods and sell them at reduced price. It rarely if ever sold raw materials by themselves.

"5. Misemer almost always recouped its cost of the old inventory by engaging in the practices above. Only very rarely did it dispose of this inventory at below its cost. Occasionally, it received more than its cost.

"6. Shortly after the one year anniversary date of the sale, Empire sent a letter to Misemer claiming that it had inventory ('Misemer inventory') on hand unsold after one year from the date of sale with a book value of approximately $1,800,000.00. This greatly exceeded any amount plaintiffs ever had on hand at the end of a year during the time he operated the business. At the end of 1995, plaintiff had on hand inventory more than two years old of a value of $70,000.00. At the end of 1996, the value of such was $150,000.00.

"7. Plaintiffs disputed the amount of unsold inventory and the parties agreed to arbitrate. The arbitrators found that the book value of the unsold inventory amounted to $1,329,653.00. They awarded this amount to Empire plus costs, interest, and attorney fees.

"8. Misemer paid the foregoing amounts to Empire.

"9. Empire made only one payment to Misemer for disposal of inventory that remained on hand after the one year anniversary date of the contract. That occurred in October, 1999, in the amount of $28,430. This was over one and a half years after the first anniversary date of the contract.

"10. About this time Empire decided to exit the candle business. In connection with this decision it entered into a contract with one Tom Mastaw to liquidate the 'Misemer inventory' by means of an auction. Empire decided on the auction at this time partially because the lease at the warehouse where the inventory was being stored was about to expire and the approaching holidays were thought to be favorable for candle sales.

"11. Before Empire decided on the auction, it discussed with Mastaw the obtaining of bids from potential buyers of the inventory. It only gave Mastaw five days to obtain bids for the entire 'Misemer inventory.' Mastaw would have utilized other methods to dispose of the inventory had he been given more time. Representatives of Empire told Mastaw that the inventory had a value of $1,300,000.00. Misemer told Mastaw that it had a value of $1,200,000.00.

"12. Prior to the sale of the business to Empire, Misemer had never disposed of or sold older inventory by means of an auction. Nor had Misemer ever engaged the services of anyone to liquidate older inventory in one bulk sale.

"13. On November 5, 1999, Misemer filed this action and obtained a temporary restraining order stopping the auction.

"14. Prior to the scheduled auction, Empire had decided to sell its assets. It completed the sale except for the 'Misemer inventory' in December 1999 to a company by the name of Empire Candle Manufacturing, L.L.C.

"15. To the whatever extent Empire exists today, its president and CEO is Naresh Nakra, the president and CEO of Diamond Brands, Inc. There are no other employees.

"16. In January, 1999, Empire had approximately one hundred employees. About eighty of these worked in manufacturing. The sales force consisted of three or four people plus fourteen or fifteen employees of Diamond Brands, Inc.

"17. Empire has no manufacturing capability at the present time and no longer engages in any business of any kind.

"18. Diamond Brands, Inc. has no capability on its own to convert any of the raw materials in the 'Misemer inventory' into finished goods. In order to accomplish this Empire would have to contract with some other entity and pay for the manufacturing.

"19. There was some confusion as to what constituted the 'Misemer inventory' after Empire sold its assets to Empire Candle Manufacturing L.L.C. The latter [inadvertently] co-mingled some of it with what it had purchased from Empire and then converted it to finished product and sold it.

"20. It appears that Empire disposed of millions of dollars of the inventory that it purchased from Misemer. The record does not clearly reflect why it was not able to dispose of the amount now in question particularly in light of Empire's argument that it still is able to dispose of the 'Misemer inventory' in accord with Misemer's past practices."

The district court concluded as a matter of law that Empire committed an anticipatory and partial breach of the contract by selling its assets, except the Misemer inventory, in December 1999 to a company called Empire Candle Manufacturing, L.LC. After the sale of its assets, Empire had no manufacturing capability and no longer engaged in business of any kind. Empire's parent company, Diamond Brands, Inc., had no capability to convert any of the raw materials in the Misemer inventory into finished goods.

The district court concluded, in these circumstances, that Empire would "incur more direct costs of inventory disposal than if it retained its own manufacturing capability." The district court further concluded that, after the sale of its assets, Empire was not in a position to dispose of the Misemer inventory "in a manner in which [Misemer] will realize the type of recovery that resulted from 'the past practices of [Misemer] regarding the disposal of obsolete or slow-moving inventory.'"

The district court figured the amount of damages suffered by Misemer on account of the breach as $1,200,000. The district court's damages computation centers on an approximation of the

book value, which was based on several sources. (1) The book value of the Misemer inventory as determined by the August 1999 arbitrator's award was $1,329,653. Between the arbitration award and the time of the breach, Empire paid one remittance of $28,430 to Misemer. (2) Empire told the auctioneer that the inventory had a value of $1,300,000. (3) Misemer told him it had a value of $1,200,000. The district court's awarding the estimated book value to Misemer as the amount of damages resulting from the breach was based on Misemer's uncontroverted evidence that, during the time Misemer operated the business, it almost always recovered its cost, *i.e.*, book value, when it disposed of old inventory, sometimes by recovering a little more and sometimes a little less. By the terms of the agreement, Empire was required to dispose of old inventory in accordance with Misemer's past practices. The district court's assumption was that Empire, using Misemer's methods, ought to have recovered near book value. But for the breach, that recovery less direct costs of disposal would have been remitted to Misemer. Hence, according to the district court, Misemer suffered a financial loss of $1,200,000 as a result of the breach.

We review the district court's decision in this case to determine whether its findings of fact are sufficient to support its conclusions of law, which involves a question of law based on given facts. *Kansas Gas & Electric Co. v. Will Investments, Inc.*, 261 Kan. 125, 128, 928 P. 2d 73 (1996). Our review of questions of law is unlimited. *Lindsey v. Miami County National Bank*, 267 Kan. 685, 690, 984 P.2d 719 (1999).

The choice-of-law provision in the agreement at issue provides that "[a]ll questions concerning the validity, operation, enforceability, interpretation, construction, and effect of this Agreement" are governed by Minnesota law. The general rule, and the Minnesota rule, governing damages in a breach of contract action is that the damage award should be a monetary amount sufficient to place the plaintiff in the same situation as if the contract had been performed. *Christenson v. Milde*, 402 N.W.2d 610, 613 (Minn. App. 1987). Under the terms of the agreement between Misemer and Empire, Misemer was to pay book value of Misemer inventory remaining after one year. Misemer paid $1,329,653. Empire was

to continue disposing of the Misemer inventory according to Misemer past practices and remit the amounts it recovered less direct costs of disposal. Empire remitted $28,430 recovered from the disposal of some remaining Misemer inventory. Misemer was out of pocket $1,301,223. On the basis of the evidence, the district court awarded Misemer $1,200,000.

Empire first argues that there was insufficient evidence to support the damages award. Empire cites several loss-of-profit cases for the well-known sister principles that contract damages must be shown with a reasonable degree of exactness and that speculative damages are not recoverable. *Cardinal Consulting Co. v. Circo Resorts*, 297 N.W.2d 260, 266-67 (Minn. 1980); *Leoni v. Bemis Co., Inc.*, 255 N.W.2d 824, 826 (Minn. 1977). The cases he cites are Minnesota cases, in keeping with the choice-of-law provision in the agreement. The district court considered the circumstances of this case to be analogous to loss of profits and cited a Kansas loss-of-profit case on assessing damages, *Vickers v. Wichita State University*, 213 Kan. 614, 518 P.2d 512 (1974). The Minnesota and Kansas cases are not in conflict on the basic principle that there must be reasonable certainty in proof of loss. Absolute certainty is not required. In *Cardinal Consulting*, the Minnesota court stated that lost profit damages may be recovered where

"their amount is shown with a reasonable degree of certainty and exactness. This means that the nature of the business or venture upon which the anticipated profits are claimed must be such as to support an inference of definite profits grounded upon a reasonably sure basis of facts. . . . This rule does not call for absolute certainty." 297 N.W.2d at 266.

In *Leoni*, the Minnesota court approved an award of damages for loss of future profits of a new business in spite of its general rule that such loss would be too speculative. The Minnesota court stated: "This general rule derives from the fact that, lacking a history of profits, new businesses rarely have evidence upon which an award of damages may be based with the requisite degree of certainty. McCormick, Damages, § 29, p. 107." 255 N.W.2d at 826.

In the present case, there was evidence of Misemer's history of, on average, recovering book value by sometimes recovering a little less and sometimes recovering a little more than book value when

it disposed of old inventory. This evidence establishes Misemer's damages to a reasonable degree of certainty.

On this point, Empire also cites *Faust v. Parrott*, 270 N.W.2d 117 (Minn. 1978). Although superficially similar to the present case in that both involve partial breaches of asset purchase agreements, *Faust* differs in material facts. Faust purchased the business assets and goodwill of a salvage business; Parrott contractually promised not to compete within 100 miles. A jury found that Parrott breached the covenant not to compete. The measure of damages was profits lost by Faust as a direct result of Parrott's competitive activities. Under these facts, Faust's burden was to show that its decline in profitability was directly attributable to Parrott's competition as opposed to being the result of factors other than Parrott's breach.

The parallel that Empire would have the court draw with *Faust* is that Misemer failed to show that without the breach it would have recovered the approximate book value of the old inventory. In *Faust*, there were many potential explanations for the decline in profits, but plaintiffs had not presented evidence that would rule out or even diminish the likelihood of nonbreach reasons. Under the agreement in the present case, Misemer paid $1,329,653 to Empire for book value of the old inventory. Empire remitted only $28,430. Empire breached the agreement by selling its assets, thereby putting itself in a position where it was unable to employ Misemer's past practices to dispose of the remaining old inventory. Misemer lost recovery of the book value he paid as a consequence of Empire's breach. Causation of the loss, which lay at the heart of the court's remand in *Faust*, is not an issue here.

Empire also argues that Misemer presented no evidence on the critical damages questions regarding the aging inventory—how much value it had lost, what Empire's costs of disposal would have been, if there was a market for the aging inventory, and whether an auction would have recovered more than disposal by Misemer's past practices. The premise on which Empire builds this argument is a misstatement of the district court's decision. Empire states that it breached its contract not only by selling all its assets but also by attempting to sell the old inventory at auction. Empire's attempt

to auction the old inventory, however, was enjoined before it could become a breach of the contract. The district court concluded that Empire "committed an anticipatory and partial breach of the contract when it sold its assets to Empire Candle Manufacturing L.L.C. in December 1999." The sale of the assets constituted a breach of the contract provision that required Empire to dispose of Misemer inventory according to Misemer's past practices because the sale of the assets stripped Empire of the capability to engage in Misemer's past practices. The damages that Misemer had the burden to show were those caused by Empire's not having the capability to dispose of Misemer inventory according to Misemer's past practices. Accordingly, Misemer's evidence was of past practices and the recovery from disposal of old inventory using those practices. Misemer had no evidence to offer regarding diminishing value or marketability of aging inventory because Misemer's evidence of its past practices was that there was a

"need to make sure that any of inventory that was left over at the end of the season was sold. So from the very beginning, we made sure that we moved out the inventory that was left over at the end of the season. We did that every year. With every season, we talked about it and moved that inventory out."

Engaging in the practice of promptly disposing of old inventory, Misemer had no old inventory in 1993 or 1994, and in 1995 "it was somewhere in the seventy thousand dollar range and in [19]96 it was $147,000."

Misemer had the burden of proving its damages. It did so with evidence of the amount it paid, according to the agreement, out of pocket for book value of the Misemer inventory and evidence that on average it recovered approximately book value when it disposed of old inventory. A reduction of damages asserted by the defendant, like mitigation of damages in cases of breach of contract, is for the defendant to show. 22 Am Jur. 2d Damages § 908, p. 930, citing *Miller v. Kruggel*, 165 Kan. 435, 195 P.2d 597 (1948). Evidence that the value of Misemer inventory was reduced due to age, costs of disposal, marketability, and whether an auction would have recovered more than disposal by Misemer's past practices was Empire's responsibility. In any event, there was evidence on those subjects, most of it introduced by Misemer.

Thomas Mastaw, who had been hired by Empire to auction the Misemer inventory, was called as a witness by Misemer. He testified that he had been told that the inventory was worth $750,000. He expressed the opinion that auction proceeds would have been between $350,000 and $450,000. He believed that an auction would garner as much as sale of the inventory. He stated no basis for his belief.

Drummond Crews also was a plaintiffs' witness. He was hired by Kent Misemer in August 1991 as national sales manager for Empire Manufacturing. Within a few months, Crews became president of the company. He remained in that position until February 1997, when the assets of the business were purchased by Empire Candle. He continued working as president of the successor company, Empire Candle. He no longer had full say about operations, and he did not agree with some of the changes instituted by new management in manufacturing and marketing. Crews believed that time proved him right. In December 1999, Crews purchased the assets of Empire Candle and became the president of Empire Candle Manufacturing, L.L.C. Crews excluded the Misemer inventory from the assets he purchased. He paid approximately 15 cents on a dollar for the inventory he purchased from Empire, "a ridiculously low low price." He described the Empire inventory as being similar to the Misemer inventory. The Misemer inventory was excepted from the noncompete clause of the agreement.

Crews testified that when he worked for Misemer, they disposed of 1-or 2-year-old inventory either by creating a special item and pricing it to sell or displaying items along with regular products at trade shows. The aim was to recover cost and "[m]ost of the time [they were] pretty successful." They did not use inventory liquidators or salvagers or auctioneers.

Crews testified that in August 1997 he was instructed to dispose of new inventory before getting into the Misemer inventory. He also reported a subsequent, less pointed conversation with another member of management on the same topic.

With regard to reduction of the value of the Misemer inventory, Crews testified that inventory depreciates over time. He said that Misemer's sales force remained after Empire bought the assets and

that personnel changes did not occur until early 1998. In the first year after the sale, a significant percentage of the Misemer inventory was disposed of.

Kent Misemer testified that the one remittance check he received from Empire was for $28,000, which was less than half the book value of the inventory that had been disposed of.

Empire also argues that Misemer failed to show that he sustained monetary damage as a result of the breach because the evidence establishes that the proceeds of an auction would have exceeded a sale of the Misemer inventory at the going market rate. This argument seems to be based on Crews' testimony that he purchased Empire's inventory for 15 cents on the dollar. He characterized the price as "ridiculously low low." There is nothing in the evidence even to suggest that what Crews paid for Empire inventory was "the going market rate."

Empire argues that the district court computed damages as if the breach occurred in February 1998, rather than in December 1999. The general rule is that damages are to be measured as of the date of the breach. 22 Am Jur. 2d Damages § 79, p. 92. Empire's argument seems to be that the district court violated the general rule by awarding $1,200,000. The evidence, however, does not support the assertion that $1,200,000 would have been the amount of the damages had they been computed in February 1998. In February 1998, Empire claimed that the book value of the Misemer inventory was more than $1,800,000. The arbitration hearings were held in late June and early July 1999. After arbitrating the amount, Misemer paid Empire $1,329,653.

In addition to the book value, as determined by arbitration, the district court based its damages award on "the statements of both plaintiff and defendant to the auctioneer as to the value of the Misemer inventory and that defendant has previously paid a small amount to plaintiff for inventory disposal." The statements of plaintiff and defendant were the subject of the district court's finding number 11: "Representatives of defendant [Empire] told Mastaw that the inventory had a value of $1,300,000.00. Plaintiff [Misemer] told Mastaw that it had a value of $1,200,000.00." Empire has not challenged the district court's finding. Because Mastaw, the auc-

tioneer, did not enter the picture until late October or early November 1999, we can assume that the valuations given by the parties for the Misemer inventory were current at that time. The breach occurred approximately a month after the scheduled auction.

Empire argues that the district court mistakenly relied on the book value of the Misemer inventory in computing damages without regard for depreciation. In essence, this argument is simply a rephrasing of the previous argument that damages had not been calculated as of the time of the breach. This argument, too, fails from lack of supporting evidence.

As stated in the preceding paragraph, in addition to the book value determined by arbitration in August 1999, the district court based its damages award on the parties' valuations of the Misemer inventory as communicated to the auctioneer, presumably in late October or early November 1999.

There was testimony by Crews that inventory generally depreciates with age. With regard specifically to the condition of the Misemer inventory, Empire refers the court to this question to Crews and his answer: "Q. I believe you testified in your deposition you would expect significant deterioration to the missing inventory by November of 1999? A. Yes." Empire, in the statement of facts in its brief, makes Crews' "expectation" out to be an established fact—"By November 1999, the inventory was almost three years old, had depreciated in value, and its physical condition had significantly deteriorated." Crews' testimony, however, was nothing more than conjecture. Empire urges the court to accept Crews' testimony that he paid 15 cents on the dollar for Empire's inventory as establishing the value of the Misemer inventory. Determining the value of Misemer inventory to be 15% of book value would not be a reasonable inference from the "ridiculously low low" price Crews paid. The circumstances in which that price was set were unique in that the inventory sale was part of Crews' agreement to purchase Empire's assets, and Crews' characterization of the price seems to indicate that he regarded it as bearing no relation to reasonable value. Crews' excluding the Misemer inventory from the purchase cannot be construed as evidence of its lack of value

because there is no evidence of the reason for the exclusion, which likely was due to its being the subject of this dispute.

Empire urges the court to consider the amount of its postarbitration remittance as evidence of the depreciated value of the Misemer inventory. Misemer testified that he received a check in approximately the amount of $28,000. He believed that the book value on the inventory that had been disposed of was "in the 60-some thousand dollar range."

We do not know how much of the difference between the approximately $60,000 book value and the $28,000 remittance was accounted for by Empire's direct costs of disposal. This evidence of the difference between book value and remittance from one sale of a small portion of the inventory seems to be the best evidence of depreciated inventory, and it is inexact and amounts to very little.

Empire also urges the court to consider the $350,000-to-$450,000 estimate of what the auction revenues would have been if it had not been enjoined. The estimate is of auction revenues. It is not an estimate of the depreciated value of the inventory. Nor is it an estimate of the revenue that could be generated by disposing of the inventory according to Misemer's past practices. Even if an estimate of the auction revenues were material to Misemer's damages, the $350,000-to-$450,000 estimate would not be reliable evidence for valuing the Misemer inventory. Misemer testified that Mastaw told him Empire hired him to auction $1,300,000 worth of merchandise, but the inventory Empire turned over to Mastaw was about half that amount.

It appears that the damages award put Misemer in a somewhat better situation than he would have been in if the contract had been performed. The damages award, however, accurately reflects the evidence. Misemer's damage award was $1,200,000. Misemer's evidence showed that he was out of pocket $1,301,223, which was the amount of the arbitration award he paid to Empire less Empire's $28,430 remittance. Misemer's evidence showed that, in its experience of disposing of old inventory, Misemer generally recovered cost of the inventory. The measure of the damages was how much of his out-of-pocket amount he would have recovered if Empire had disposed of the remaining Misemer inventory ac-

cording to Misemer's past practices. The one small remittance, which did not show actual book value of the inventory or costs of disposal, is not sufficient to support a reduction in established damages. The evidence that would have established to a reasonable degree of certainty how much of his out-of-pocket amount Misemer would have recovered if the contract had been performed was evidence that Empire should have presented. The remaining Misemer inventory was under Empire's control, disposal of it was up to Empire, and Empire's costs of disposal depended on its methods.

In *Peters v. Mutual Ben. Life Ins. Co.*, 420 N.W.2d 908, 916 (Minn. App. 1988), the court stated: "The trial court has broad discretion in determining whether to grant a new trial for excessive damages." The trial court in *Peters* "expressly found that an award of $365,000 for a business generating $114,000 in profits was fully supported by the evidence and was not excessive." 420 N.W.2d at 916. The award was upheld on appeal because the trial court's "finding was not a clear abuse of discretion." 420 N.W.2d at 916. Here, the damages award was supported by the evidence.

The final argument that Empire makes with regard to the damages award is that the district court failed to recognize the effect of the arbitration award in calculating damages. Empire argues it constitutes res judicata, collateral estoppel, or issue preclusion. There is no merit to the argument because the premises on which it is based are faulty. Empire misstates what the district court determined constituted the breach. Empire asserts that "[t]he district court's decision focuses on events that took place prior to March 1, 1999, as a springboard for determining that Empire breached the Agreement by not disposing of the Misemer inventory in accordance with Misemer's prior practices." Contrary to this assertion, the district court found that Empire breached the agreement in December 1999 by selling its assets, thereby placing itself in a position where it was incapable of disposing of the Misemer inventory in accordance with Misemer's prior practices. Empire also misstates the scope of the arbitration decision. Empire asserts that the arbitration panel determined that Empire followed Misemer's prior practices for 2 years and that, after those 2 years, inventory

with a book value of $1,300,000 remained unsold. The arbitration award expressly settles claims "based on any event occurring before March 1, 1999." The inventory disposal provision of the agreement had no utility until February 28, 1998, which was 1 year after the agreement was executed. Thus, the arbitration decision involved only 1 year of disposal practices. In any event, whether Empire adhered to Misemer's past disposal practices before it sold the assets in December 1999 is irrelevant to the question of breach. If Empire's argument is that the district court should have reduced the damages award based on an inference based on the arbitration decision that the inventory could not be disposed of using Misemer's past practices, the argument fails because the arbitration decision does not support such an inference. The arbitration decision settled accounts as of March 1, 1999, by which date Empire had by one method or another disposed of all but $1,300,000 of the original $7,500,000 Misemer inventory.

Empire next argues that the district court erred in concluding that Empire committed an anticipatory breach of contract. We find no merit to this argument. It is based entirely on a false premise. In arguing that it did not commit the breach the district court determined, Empire misstates the nature of the breach. Empire asserts that "[t]he district court judge found that Empire breached its contract because of the failure to follow Misemer's past practices." In fact, the district court determined that the breach occurred when Empire sold its assets in December 1999. Whether Empire followed Misemer's past practices is not an issue.

Empire's final argument is that the district court abused its discretion in granting the temporary restraining order. The granting of injunctive relief involves the exercise of judicial discretion and will be reviewed by this court for abuse of discretion. *Kansas East Conf. of the United Methodist Church v. Bethany Med. Ctr.*, 266 Kan. 366, 377-78, 969 P.2d 859 (1998).

The district court's Temporary Restraining Order is dated November 5, 1999. It contains nine "specific findings":

"1. That the defendant has indicated that it intends to dispose of certain inventory by auction on November 6, 1999 at 10:00 a.m.

"2. That the inventory that is to be disposed of includes inventory that is the subject of an agreement between the plaintiffs and the defendant.

"3. That under the terms of the agreement between the parties defendant is to dispose of unsold inventory in accordance with past practices of the plaintiffs.

"4. Plaintiffs in their verified petition have indicated that never in the history of the company has inventory been disposed of by auction.

"5. Plaintiffs in their verified petition have represented their belief that if the property is disposed of by auction the amount received will not be adequate.

"6. Plaintiffs in their verified petition have represented that to the present date defendant has not consulted with the plaintiffs regarding its intention to dispose of the property that is the subject of the agreement by auction.

"7. The Court is of the view that the defendant should be restrained from disposing of the inventory by auction until such time as the Court has had an opportunity to consider the testimony of the parties regarding disposal of the inventory through auction.

"8. The Court finds that unless the defendant is restrained from disposing of certain inventory by auction that there is substantial likelihood that the plaintiffs will sustain irreparable harm.

"9. Accordingly, the Court finds that in order to maintain the status quo it should enter its order restraining the defendant from disposing of the inventory that is subject to section 10.3 of the agreement between the parties by auction."

Based on the findings, the district court temporarily restrained Empire from disposing of the Misemer inventory by auction. In the order, the district court scheduled a hearing on the Application for Temporary Injunction for November 17, 1999.

Empire argues that Misemer had a legal remedy in damages for breach of contract and therefore would not have suffered irreparable harm if the November 6 auction had taken place. Empire cites *Sampel v. Balbernie*, 20 Kan. App. 2d 527, 530-31, 889 P.2d 804 (1995), where the court enumerated criteria for obtaining injunctive relief:

"Injunctive relief is an equitable remedy. To obtain injunctive relief from a prospective injury, the movant must show: (1) there is a reasonable probability of irreparable future injury to the movant; (2) an action at law will not provide an adequate remedy; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) the injunction, if issued, would not be adverse to the public interest."

Here, Misemer sought injunctive relief in order to prevent Empire from breaching the contract by disposing of the inventory

by auction. Misemer's petition for relief alleged that disposal of the inventory by auction would constitute a breach of the agreement.

Monetary damages for the breach of contract would have been available to Misemer if the district court had not enjoined the auction. The district court's action, therefore, was taken without regard to the criteria set out in *Sampel*. This court, as well as the Court of Appeals, has stated the necessity for a party seeking injunctive relief to show that an action at law will not provide adequate remedy. *Mid-America Pipeline Co. v. Wietharn*, 246 Kan. 238, 242, 787 P.2d 716 (1990), and 266 Kan. 366, 382-83. Here, Misemer would have had an adequate remedy at law for breach of contract.

The question is whether the district court's granting injunctive relief in order to prevent a breach of contract constitutes an abuse of the district court's discretion. "Judicial discretion is abused when judicial action is arbitrary, fanciful, or unreasonable, which is another way of saying that discretion is abused only where no reasonable person would take the view adopted by the trial court." *Simon v. Simon*, 260 Kan. 731, Syl. ¶ 2, 924 P.2d 1255 (1996). Here, the measure of the trial court's discretion is bounded by the above criteria. Thus, the trial court's action in granting injunctive relief when the criteria were not satisfied is an abuse of discretion.

Without citing authority for the remedy it seeks, Empire asks this court to remand the matter to the district court for determination and award of costs it wrongfully incurred as a result of the restraining order. Empire mentions out-of-pocket expenses in setting up and advertising the auction, which was enjoined 1 day before it was scheduled to take place. Empire also asserts that the inventory now will be less valuable than it was at the time the district court prohibited the auction, and it wants to recover the loss in value. We reject Empire's request to remand. The trial court considered those factors in determining the damages award. Further, as Misemer points out, the injunctive relief never went beyond the temporary restraining order and Empire has not been prohibited from disposing of the Misemer inventory by auction since shortly after the November 6 auction was cancelled. In fact, on November 17, 1999, just 12 days after the restraining order was

issued, the parties jointly agreed to dissolve the temporary restraining order.

The district court's judgment on liability and damages is affirmed.

DAVIS, J., not participating.

LEE A. JOHNSON, J., assigned.