No. 54,411

HERBERT E. HUSER, *et al., Appellants,* v. DUCK CREEK WATERSHED
(JOINT) DISTRICT NO. 59, WILSON, MONTGOMERY AND ELK COUN-
TIES, *Appellee.*

(668 P.2d 172)

Opinion filed
August 17, 1983.

2 

*Jon R. Viets,* of Hall, Levy, Lively, Viets & DeVore, of Coffeyville, argued the cause and was on the brief for appellants.

*Michael G. Glover,* of Lawrence, argued the cause and was on the brief for appellee.

The opinion of the court was delivered by

HOLMES, J.: Herbert E. Huser and Ethel M. Huser, his wife, appeal from an adverse decision in an action wherein they sought a writ of mandamus and a mandatory injunction against Duck Creek Watershed (Joint) District No. 59, Wilson, Montgomery and Elk Counties (hereafter Duck Creek) concerning the construction and maintenance of a flood control dam and lake on the appellant's property. Appellants also sought a declaratory judgment establishing their right to appropriate water from the project for irrigation purposes. The trial court denied all relief sought and the Husers have appealed.

The dam and lake in question were constructed by Duck Creek pursuant to the Kansas watershed district act, K.S.A. 24-1201 *et seq.* Duck Creek was originally formed in 1963 and encompasses land in the Duck Creek watershed extending over portions of three counties. In 1969, Duck Creek adopted a general plan for the district which was approved by the chief engineer of the Division of Water Resources of the Department of Agriculture of the State of Kansas. The general plan was adopted for the purpose of flood control and contemplated the construction of a dam and water storage facility on property subsequently purchased by the appellants. On December 20, 1971, the fee owner of the property, Theodore Myers, executed an easement to Duck Creek. The easement provided, in pertinent part:

"[F]or or in connection with the construction, operation, maintenance, and inspection of a flood water retarding structure designated as Site No. 7-30(2) in the Duck Creek Watershed to be located on the above described land. And for the flowage of any waters in, over, upon, or through such structure, and for the permanent storage and temporary detention, either or both, of any waters that are impounded, stored or detained by such structure.

. . . .

"There is reserved to the Grantor, his heirs and assigns, the right and privilege to use the above described land of the Grantor at any time, in any manner and for any purpose not inconsistent with the full use and enjoyment by the Grantee, its successors and assigns, of the rights and privileges herein granted."

In December, 1974, the Husers purchased the property from

Myers subject to the easement. Mr. Huser was fully aware of the easement, its terms and the general plan of Duck Creek for the development of the flood control project in the district, including Dam Site No. 2, which was to be located upon the property purchased from Myers. Dam Site No. 2 was constructed during 1978 and the spring of 1979 upon appellants' property. This action was filed May 9, 1979.

K.S.A. 24-1201 *et seq.* provides for the establishment and function of watershed districts in this state. The general corporate powers and duties of a watershed district formed pursuant to the act are set out in K.S.A. 24-1209, which provides in pertinent part:

"Each watershed district incorporated under the provisions of this act shall be a body politic and corporate and shall have the power:

. . . .

*Fourth.* To construct, improve, maintain and operate works of improvement including such facilities and appurtenances as necessary for the conservation of soil, prevention of floods, disposal of water and the conservation, development and utilization of water for domestic, municipal, agricultural, industrial, recreational purposes and such other uses as may be authorized by the provisions of K.S.A. 82a-701 to 82a-725, inclusive, and any amendments thereto."

K.S.A. 24-1213 - 1218 set forth the procedures for undertaking watershed projects and improvements. Reference is made in those statutes to a "general plan" which must be submitted by the district for approval of the chief engineer of the division of water resources of the Kansas state board of agriculture. The "general plan" is defined in K.S.A. 24-1202(*m*) to mean:

"[A] preliminary engineering report describing the characteristics of the district, the nature and methods of dealing with the soil and water problems within the district, and the projects proposed to be undertaken by the district. It shall include maps, descriptions and such other data as may be necessary for the location, identification and establishment of the character of the work to be undertaken and such other data and information as the chief engineer may require."

The statutes make provision for the general plan to be modified as to the plan itself or as to its financing and for such modifications to be submitted to the chief engineer for subsequent approval. K.S.A. 24-1214. The statutes do not specify the degree of exactitude with which the district must comply with approved plans. K.S.A. 24-1216 calls for "detailed construction plans and specifications" for projects in the watershed district whenever

the district determines such projects should be undertaken. The statute also requires that the project plans be in "conformance to the general plan and other applicable state laws on water use and control" and that the project plans also be submitted to the chief engineer for approval, disapproval or modification. Again, the statutes are silent as to any requirement for exact conformity or the degree of compliance with the general plan.

The act, itself, makes no provision for appeals to the district court from decisions of the watershed district board of directors. In the absence of a statutory provision for appellate review of an administrative decision, no appeal is available. However, relief from illegal, arbitrary and unreasonable acts of the district can be obtained using an extraordinary remedy like mandamus, quo warranto or injunction. *Bush v. City of Wichita,* 223 Kan. 651, 576 P.2d 1071 (1978); Ryan, Judicial Review of Administrative Action—Kansas Perspectives, 19 Washburn L.J. 423, 426 (1980).

The Husers, in their first claim for relief, assert that the dam and lake as constructed materially and substantially departed from the general plan and the construction plans. These contentions are based upon the size of the finished lake area and the location of the borrow areas from which earth was removed in order to construct the dam. Appellants sought a writ of mandamus directing the Duck Creek board of directors to specifically comply with the general plan.

K.S.A. 60-801 reads:

"Mandamus is a proceeding to compel some inferior court, tribunal, board, or some corporation or person to perform a *specified duty,* which duty results from the office, trust, or official station of the party to whom the order is directed, or from operation of law." (Emphasis added.)

As long ago as 1888, it was said:

"The only acts of public functionaries which the courts ever attempt to control by either injunction or *mandamus,* are such acts only as are in their nature strictly ministerial; and a ministerial act is one which a public officer or agent is required to perform upon a given state of facts, *in a prescribed manner,* in obedience to the mandate of legal authority, and without regard to his own judgment or opinion concerning the propriety or impropriety of the act to be performed." *Martin, Governor v. Ingham,* 38 Kan. 641, 17 Pac. 162. (Emphasis added.)

A writ of mandamus is discretionary and does not issue as a matter of right. Unless the defendant's legal duty is clear, the

writ should not issue. *State, ex rel., v. Paulsen,* 204 Kan. 857, Syl. ¶ 2, 465 P.2d 982 (1970).

Since the duty of the watershed district to strictly comply with the general plans for the watershed is not clear in the enabling statutes, mandamus would not be a proper remedy. The trial court found there was substantial compliance with the plans based upon the testimony of the construction engineers and district representatives. An examination of the record discloses that the court's findings of substantial compliance are supported by the evidence and therefore, the decision of the Duck Creek board of directors was not arbitrary, illegal or unreasonable. The mandamus was properly denied.

Plaintiff next contends that the watershed district should be compelled to plant certain grasses which he desires on the dam and lake area, grasses which he contends would be more suitable for livestock grazing than the grasses actually planted.

The watershed district has the power, authority and duty, under K.S.A. 24-1209 *Fourth* to maintain the dam and lake project. Testimony offered at trial supported the conclusion that the grasses planted were chosen for their peculiar characteristics in holding the soil and retarding erosion. According to the expert testimony, the grass desired by the plaintiff does not have the same qualities and would not serve to maintain and preserve the structure as well as that utilized by Duck Creek. As the decision of the watershed board is supported by substantial competent evidence, the refusal to grant a mandatory injunction did not constitute an abuse of discretion by the trial court. The granting or denial of an injunction is, generally speaking, discretionary. Absent an abuse of that discretion, the appellate court will not normally interfere. *Southeast Kansas Landowners Ass'n v. Kansas Turnpike Auth.,* 224 Kan. 357, 582 P.2d 1123 (1978).

Next the appellants sought a mandatory injunction to require the appellee to remove and relocate a fence which had been installed to protect the dam. The fence was installed along the same line as an earlier fence and appellants desired that it be moved and relocated as it "unnecessarily interfere[d] with plaintiffs' full use and enjoyment of their property." There was testimony that the appellee tried to place the fence where Mr. Huser wanted it placed, but for some reason failed to satisfy him.

Mr. Huser admitted at trial that the fence did not actually *prevent* his use of the land, but rather *hindered* it.

The trial court found upon the evidence presented that the fence was placed for the purpose of protecting the dam. As it did not prevent plaintiff's use of the land, the trial court did not abuse its discretion in refusing to *order* that the fence be moved. The decision to place the fence was not illegal, arbitrary or unreasonable, even though it might have been placed in a location more suitable to the appellants.

The final point raised by appellants concerns the claimed right to use water accumulated in the lake for commercial agricultural irrigation purposes. The watershed district refused to permit irrigation based upon advice of engineers that irrigation could adversely affect the lake level and thereby promote erosion and damage to the dam by wave action and wintertime freezing. Appellants sought a declaratory judgment that they had a right of access to use water from the lake for irrigation purposes. The court based its decision to deny the declaratory judgment on its finding of a potential for damage to the dam and the conclusion that no water rights were reserved for the plaintiff's benefit in the original easement granted to the watershed district. The stated purposes of the easement were flood control, water flowage and water storage. The reservation of rights in the original easement is for purposes "not inconsistent" with the grantee's rights. The watershed district has the responsibility for the maintenance of the flood control project, including the dam in question. Costs of maintenance, as are other expenses of the district, are borne by the taxpayers in the watershed district.

Although there was evidence to the contrary, a civil engineer with the soil conservation service testified that irrigation from the impounded water could cause damage to the dam structure for which the watershed district would be responsible. He also testified that the dam was not designed or constructed for purposes of irrigation. There was similar testimony from other witnesses. As there was competent evidence that irrigation might result in damage to the dam and increased maintenance at the cost of the taxpayers, the district's action in denying access for irrigation purposes was not illegal, arbitrary or unreasonable. Based upon the evidence of potential damage to the dam, the

trial court did not commit error in refusing to enter a declaratory judgment in appellant's favor.

The judgment is affirmed.

SCHROEDER, C.J., concurring. It must be noted the finding made by the trial court that no water rights were reserved in the original easement to the grantor is not the basis upon which the decision of the trial court is upheld. The easement itself expressly states its purpose is for the construction and operation of a "flood retarding structure." The other stated purposes of the easement, water storage and water flowage, are incidental to this primary purpose and should not be read to enlarge the extent of the easement granted to the watershed district for the purpose of flood control. This easement merely gave the watershed district the right to construct, maintain and operate a flood control project on the premises of the grantor. The extent of the easement granted and the reservation of rights is left open by the court's decision.

In the record before this court neither the Duck Creek Watershed Board nor the Soil Conservation Service assert that the Watershed District acquired *water rights* to water impounded in the sediment pool of the floodwater retarding structure. The issue before the trial court was clearly indicated by the following documentary exhibits introduced into evidence at the trial.

In a letter dated January 4, 1977, Luther J. Gaskell, Project Coordinator for the Duck Creek flood control project located at Chanute, Kansas, addressed the following to William D. Younkin, Area Conservationist, Soil Conservation Service, Emporia, Kansas:

"At the Duck Creek Watershed Board meeting January 3, 1977, at Elk City, Charles Stewart, Assistant State Engineer, discussed possible effects on detention dams if they are used for irrigation. The included the 'sudden drawdown' where slippage of the front slope can take place, the possible effect of wave action on the unprotected face of the dam below the rip-rap and the possibility of livestock bypassing the stub fences if water levels are pulled too low. The first two are not expected to be serious problems on site #2 in Duck Creek, according to Charles Stewart.

"After much discussion, the board determined that they needed some further study on site #2 to determine the possible *effect of pulling the sediment pool down to or below the rip-rap level.* The landowner desiring to irrigate from site #2 was asked 'How much water do you think you will need from this reservoir?' He responded with, 'If the year is dry and my crops need water, I would pump it dry.'

"I would like help from our state office in preparing an evaluation of the probable effects of pumping site #2 down. As Robert Faler, President of the Duck Creek Watershed Board put it, 'We would like for SCS to study site #2 and advise us of the consequences of irrigation on this dam and tell us if the board should plan any modification of the dam to help reduce possible damage.'

"Stewart and I both advised them that any structural changes requested by the board under these conditions would be a local expense. Some discussion resulted about adding additional rip-rap at the bottom of the slope to reduce any chance of wave action under cutting the designed rip-rap. Another alternative mentioned by Stewart to me was the possibility of building an earthern berm across the front slope at the elevation of the bottom of the rip-rap. There may be other alternatives or the state office may determine that nothing needs to be done.

"I believe the watershed board will try to develop some type of contract or agreement whereby the landowner who desires to irrigate will be held responsible for maintenance costs and/or design changes on site #2. The landowner said he was willing to assume any cost of damages. The real problem seems to be how to determine who will be responsible for what damages. This part is the watershed board's problem, however." (Emphasis added.)

In a letter dated January 24, 1977, Robert K. Griffin, State Conservationist, located at Salina, Kansas, addressed the following to Robert Faler, President, Duck Creek Watershed Board, Elk City, Kansas:

"Jim Gaskell, RC&D project coordinator for SCS at Chanute, advises that you want additional information from the Soil Conservation Service on probable impact of irrigation usage from the reservoir on Duck Creek Site No. 2.

"*The Service does not encourage or discourage irrigation use of water in the sediment pool of a single purpose floodwater retarding structure except that such irrigation use must not interfere with the primary purpose of the structure, i.e., floodwater retarding, nor the proper maintenance of the structure.*

"As you know, the watershed board will have responsibility for structure operation and maintenance and therefore should assure itself that it has full authority to act as necessary in maintaining the structure. An irrigator using this or similar structure for irrigation water supply might naturally look upon irrigation as the top priority for the structure. Such a view should be avoided. Irrigation water supply was not designed into the structure as a purpose so irrigation must always remain secondary. Hopefully a good irrigator that values the water supply from a sediment pool would strive diligently to assist the watershed district in its operation and maintenance responsibility so that he might continue using that water supply.

"One of the possible problems arising from water drawdown could be inadequate fencing to control livestock from access to the dam area. The structure as designed depends upon deep water across most of the sediment pool area as a barrier to livestock access. When the water level is substantially lowered, then extended fencing or livestock exclusion from the adjacent area or other control would be needed. Fence that is alternatively submerged and exposed may be difficult to maintain.

"Wave action at the base of the riprap on Site No. 2 should not be a problem because the riprap will extend down quite low and the old channel location will be filled in to the elevation of the base of the riprap within 50 feet space nearest the dam.

"The dam slopes are designed with limited steepness and with adequate safety factor so that the dam is quite stable against 'sudden drawdown' or other water level variations. So mere lowering of the water, of itself, will not endanger the dam face.

"If there develop problems of structure operations and maintenance caused by irrigation, now unforseen, then the watershed board will need to solve these as they arise." (Emphasis added.)

As a follow-up on the foregoing correspondence Luther J. Gaskell, Project Coordinator, addressed a letter dated January 25, 1977, to John V. Hansen, District Conservationist, Soil Conservation Service, Fredonia, Kansas, stating:

"*Enclosed is a letter from Robert Griffin regarding the Duck Creek site number 2. It appears to me that the state office has basically told the board that there is no reason they should not proceed with permitting irrigation from this site.*" (Emphasis added.)

Obviously, from the foregoing neither the Soil Conservation Service nor the Duck Creek Watershed Board claim water rights to impounded water in the flood-retarding structure from the provisions of the easement granted.

Testimony at the trial clearly discloses the only concern of the Duck Creek Watershed Board was maintenance of the dam if irrigation was approved. Mr. Herbert Huser, the plaintiff, testified that when he talked with the president of the watershed board, Robert Faler, in 1974 concerning the possibilities of irrigation from the lake, Mr. Faler told him it would be all right with him because then the lake would hold more water for flood control. Also it would not be a problem because the dam is positioned where prevailing winds wouldn't erode it. Huser believed from the discussion that he would be able to irrigate when the lake was completed. In April 1976 his request to be permitted to irrigate from the lake was denied by the Board. In December 1976, Mr. Huser was elected to the watershed district board. He asked them to reconsider his request to irrigate. A meeting was held on January 3, 1977, to consider the request. No testimony was offered to suggest that irrigation should not be conducted from the lake. He was never told that if they changed the dam to make it possible to irrigate that he would have to pay

some of the cost. He was told the board didn't want him to irrigate because they were afraid the wind and water might wash the riprap out from the dam. Plaintiff's Exhibits 22 through 25 illustrate the riprap that is on the face of the dam. The dirt ledge illustrated in Exhibit 25 shows the earthern berm in front of the dam. It extends out about 50 feet from the base of the dam. It shows five feet or so of riprap. The berm slopes slightly toward the lake. When the lake is full about 12 to 16 inches of water covers the riprap. Prevailing winds in the summer are from the south. The way the lake is built the dam is protected from the south winds. So far there is erosion on the lake shore opposite the dam from wave action. Huser has been irrigating from this lake for the two previous years under a court order. He removed about 30 acre feet of water. If the lake level is dropped a foot below level of riprap, the shoreline will not erode from wave action because the water line will be along the long sloping area of the berm.

Norman Cook, the design engineer whose firm drew the plans for the watershed site, testified the existence of either riprap or a very gentle slope is necessary to prevent damage to the dam caused by erosion. On the plaintiff's lake the riprap extends five feet below and three feet above the water inlet, which is where most of the wave action is. Below that is a flat or very gently sloping berm. The berm protects the riprap from sliding at the bottom. The gentle slope of the berm acts to break the wave action when the water level recedes to that level. There would be no difference between the effect of natural evaporation and water drawn out of the lake by irrigation on the base of the riprap. The critical stage occurs when the wave action washes against the dam at the point where the riprap meets the ground. If irrigation accelerates the drop of the water level through that critical stage, the water would not remain at the base of the riprap and would not cause any damage. If the lake runs north and south there will be more wave action than if it runs east and west. On re-cross-examination Mr. Cook stated that if the water level was kept at the bottom of the riprap over a long period of time by irrigation it would cause more wear and tear on the dam and shorten the life of the structure. Normally in dry periods the water goes down slowly and builds back up over a short period of time. If, with irrigation, the water level remained at the bottom of the riprap, there could be considerable damage to the structure.

It would be necessary to police the water level to make sure the water level did not remain at the bottom of the riprap due to irrigation. On redirect examination the engineer stated that in a dry summer the water level would drop below the base of the riprap. His only concern was that the water level might stay at the base of the riprap over a protracted period of time. Where, during a dry season, the water would remain at the base of the riprap for a long time, it would benefit the structure for water to be removed either by irrigation or be releasing water through the draw-down pipe.

David Pope, the assistant chief engineer of the Division of Water Resources of the Kansas State Board of Agriculture (DWR), also testified. He stated that a permit for irrigation could not be given by the department pursuant to K.A.R. 5-6-2 unless the watershed board passes a resolution that the petitioner has rightful access to the structure and a right to withdraw the water. The purpose of the dam project at issue here was flood control and not irrigation.

Louis Jordan, an engineer with the DWR, also testified. He stated that the lake was not built or designed for irrigation. Irrigation affects the maintenance and longevity of the lake by the possibility of drying out the embankment below the riprap allowing cracks to develop, which may jeopardize the stability of the structure, and also the possibility of a freezing and thawing could cause the riprap to deteriorate. The prime concern is the wave action which might do damage to the critical points along the face of the dam.

It is apparent the removal of water for irrigation from the structure is not inconsistent with the district's purpose to prevent flooding of low-lying areas by using the structure to retain water. According to the plaintiff's testimony, drainage of water out of the structure would actually promote the purpose of flood control by lowering the water level so more flood water could be retained by the structure at a future time when rainfall is excessive. The easement document was not asserted by the Duck Creek Watershed Board as granting the watershed district full control of water rights to water impounded in the structure. The Board's concern was maintenance of the retarding structure. Actually, the parties are not as far apart as this lawsuit would suggest. If the landowner assumed the obligation to repair dam-

age he would be careful to avoid damage by the drawdown of the water. Assuming agreement can be accomplished on this point there is no reason why irrigation should not be permitted by the Duck Creek Watershed Board. This is consistent with the position expressed by the State Conservationist, Robert K. Griffin, in his letter of January 24, 1977, to Mr. Faler of the Duck Creek Watershed Board.

On the present state of the record, I must agree there is evidence to support the decision of the Board which denies the landowner the right to use water impounded for irrigation on the ground that damage may result to the retarding structure which the Board is obligated to maintain.

In this case the predecessor in title to the land purchased by the plaintiff was induced by representations to grant the easement herein *without charge* to the watershed district. The construction of the retarding structure had not begun when the plaintiff purchased the land subject to the easement. But prior to purchase the plaintiff consulted with the president of the Duck Creek Watershed Board regarding the right to use the water in the sediment pool for irrigation. He was told in substance there would be no problem and without question was induced to buy the land on the force of representations made to him by the president of the board.

Under the facts and circumstances presented by the record in this case, all landowners would be well advised to require Watershed Districts *to pay full compensation for the acquisition of easements for future flood control projects.* Representations in the form of inducements made by agents of a water district to acquire these easements from the landowner free of charge are of no value whatsoever, unless they are reduced to writing and made a part of the agreement granting the easement wherein all conditions are fully stated.

Full compensation requires the watershed district to pay the fair market value of all acreage that may be flooded or inundated with water at the high flood water mark in the reservoir area plus acreage taken for the detention dam and spillway (this is the damages for the acreage actually taken by the permanent easement), plus the damages, if any, to the remaining acreage resulting from the easement and access to it. This is the holding of our court in *Roberts v. Upper Verdigris Watershed,* 193 Kan. 151, 392 P.2d 914 (1964).