No. 95,193

BOARD OF COUNTY COMMISSIONERS OF LEAVENWORTH COUNTY, KANSAS, *Appellee,* v. RICHARD L. WHITSON and LINDA L. WHITSON, *Appellants.*

(132 P.3d 920)

Opinion filed April 28, 2006.

*Gregory A. Lee,* of Cooper & Lee, L.L.C., of Topeka, argued the cause and was on the brief for appellant.

*David C. Van Parys,* county counselor, argued the cause and was on the brief for the appellee.

*C. William Ossman,* of Kansas Department of Social and Rehabilitation Services, was on the brief for *amicus curiae* Secretary of Social and Rehabilitation Services.

The opinion of the court was delivered by

BEIER, J.: This zoning dispute requires us to evaluate the propriety of a requirement that defendants Richard L. and Linda L. Whitson obtain a special use permit before operating a group home for transitioning sexually violent predators in rural Leavenworth County.

This case arises out of Leroy Hendricks' successful application to move into Phase 6 of the treatment program set up by the Department of Social and Rehabilitation Services (SRS), pursuant to the Sexually Violent Predator Act, K.S.A. 59-29a01 *et seq.* (Act). In 1997, the United States Supreme Court upheld the constitutionality of civil commitments under the Act, provided such commitments facilitate mental health treatment for those subject to them. See *State v. Hendricks,* 521 U.S. 346, 138 L. Ed. 2d 501, 117 S. Ct. 2072 (1997).

Kansas' treatment program consists of eight phases; Phase 6 is designed to begin the sexually violent predator's transition to conditional independent living and "real world implementation" of the predator's "relapse prevention plan," including an "understanding . . . that . . . [the predator] will unlikely ever live a private life, free of rules [and] requirements. Appendix to Brief of Amicus Curiae Gary J. Daniels, Secretary of SRS.

SRS opposed Hendricks' application to transfer to Phase 6 when the matter was heard in district court in Sedgwick County in December 2004. Hendricks nevertheless prevailed, and the court ordered SRS to obtain and operate appropriate housing for him. Ex-

isting transitional housing set up for sexually violent predators who would be able to reenter the work force when released was not suitable for Hendricks, who, in addition to his diagnosis of pedophilia, has several physical impairments resulting from a stroke, diabetes, and age. He is now 71 years old.

As a result of the district court ruling in Sedgwick County, SRS entered into a contract with the Whitsons' company to provide housing for Hendricks and others in his position. In early June 2005, Hendricks moved into a residence at 24130 Golden Road in rural Leavenworth County. The residence was zoned " 'R' rural district," which permits one-family dwellings. See Leavenworth County Zoning and Subdivision Regulations, Art. 5, § 2.2 (2005). The operation of a group home in such a district requires a special use permit. Art. 22 § 9.17.

When Hendricks moved into the residence on June 1, 2005, the Whitsons had obtained neither an SRS license nor a special use permit. Two days later, the Board of County Commissioners for Leavenworth County (Board) filed this action and obtained a temporary restraining order based on the Whitsons' failure to obtain an SRS license. As a result, Hendricks was transferred to Osawatomie State Hospital, where he has remained throughout the subsequent proceedings in this case.

The Whitsons corrected the licensure problem approximately 3 weeks later. They applied for a license to provide "Sex Predator Treatment Program Transitional Living for Handicapped Adults," and SRS granted a provisional license to a "Group Home" at the 24130 Golden Road address to provide "RESIDENTIAL CARE FOR PERSONS IN THE SEX PREDATOR TREATMENT PROGRAM UNDER THE PROVISIONS OF K.S.A. 75-3307B AND REGULATIONS PROMULGATED THEREUNDER." Once this license was secured, the Whitsons moved to vacate the restraining order obtained by the Board.

Before the Whitsons' motion could be heard, the Board adopted Resolution 2005-31, which amended Article 3 of the Leavenworth County Zoning and Subdivision Regulations to add definitions for "Adult Care Facility or Group Home," "Socially Disabled," "Detention Facility," and "Post-Release Facility." It also amended Ar-

ticle 22, § 9 of the Regulations to add "Adult Care Facility or Group Home," "Detention Facility," and "Post Release Facility" to the list of uses requiring a special use permit. The Board then filed an application for a temporary and a permanent injunction, based on the Whitsons' failure to obtain such a permit.

At the hearing in the district court, Dr. Austin DesLauriers testified that Hendricks remained a "sexually violent predator" because he "continues to meet the definition of a person who has been convicted of a sexually violent offense." DesLauriers also testified that Hendricks had a "mental impairment that substantially limits his major life activities," *i.e.*, pedophilia. Nevertheless, DesLauriers expressed the opinion that Hendricks was ready for placement in a supervised Phase 6 facility; although Hendricks would be a danger to others if he were at large in the community, he would not be a danger to others in a structured group home setting. DesLauriers' October 19, 2004, report on Hendricks' condition had said:

"[W]hile Mr. Hendricks' mental abnormality cannot be said to have so changed as to fully eliminate his risk of re-offense, it does seem appropriate, given his reduced risk to re-offend based on his age and health concerns, that Mr. Hendricks should probably soon be considered for placement in an assisted living, nursing or other medical care setting which will meet his medical needs and allow him to demonstrate whether or not he can apply the concepts he has learned and the coping plans he has made to the complexities of real-life situations."

The district court ruled in favor of the Board, ultimately granting a permanent injunction preventing the Whitsons from operating the 24130 Golden Road residence as a group home for transitioning sexually violent predators without obtaining a special use permit. The district judge rejected the Whitsons' argument that K.S.A. 12-736(e) overrode the County's regulations. The statute provides in pertinent part:

"(a) It is hereby declared to be the policy of the state of Kansas that persons with a disability shall not be excluded from the benefits of single family residential surroundings by any municipal zoning ordinance, resolution or regulation.

"(b) For the purpose of this act:

(1) 'Group home' means any dwelling occupied by not more than 10 persons, including eight or fewer persons with a disability who need not be related by blood or marriage and not to exceed two staff residents who need not be related

by blood or marriage to each other or to the residents of the home, which dwelling is licensed by a regulatory agency of this state;

(2) 'municipality' means any township, city or county located in Kansas;

(3) 'disability' means, with respect to a person:

(A) A physical or mental impairment which substantially limits one or more of such person's major life activities;

(B) a record of having such an impairment; or

(C) being regarded as having such an impairment. Such term does not include current, illegal use of or addition to a controlled substance, as defined in section 102 of the controlled substance act (21 U.S.C. 802);

. . . .

"(c) (1) No mentally ill person shall be eligible for placement in a group home unless such person has been evaluated by a licensed provider and such provider determines that the mentally ill person is not dangerous to others and is suitable for group-home placement. A group home shall not be a licensed provider for the purposes of evaluating or approving for placement a mentally ill person in a group home.

(2) No person shall be eligible for placement in a group home if such person is: (A) Assigned to a community corrections program or a diversion program; (B) on parole from a correctional institution or on probation for a felony offense; or (C) in a state mental institution following a finding of mental disease or defect excluding criminal responsibility, pursuant to K.S.A. 22-3220 and 22-3221.

. . . .

"(e) No municipality shall prohibit the location of a group home in any zone or area where single family dwellings are permitted. Any zoning ordinance, resolution or regulation which prohibits the location of a group home in such zone or area or which subject group homes to regulations not applicable to other single family dwellings in the same zone or area is invalid."

In arriving at this result, the district court judge cited Article 5 of the regulations and discussed only "group homes"; he did not mention Resolution 2005-31 or the three uses added to Article 22 by that enactment. He also specifically noted the legislature's statements regarding the dangerousness of sexually violent predators at the time the Act governing their civil commitments was passed.

The Whitsons advance three arguments on this appeal: (1) The Board failed to provide evidence that County residents would suffer irreparable harm if injunctive relief was denied; (2) The district court erred in concluding that K.S.A. 12-736(e) did not apply; and (3) Resolution 2005-31 is unconstitutional. We address each in turn.

## Irreparable Harm

This court's standard of review on the grant or denial of an injunction is abuse of discretion. *General Building Contr. LLC v. Board of Shawnee County Comm'rs*, 275 Kan. at 525, 541, 66 P.3d 873 (2003); *Huser v. Duck Creek Watershed Dist. No. 59*, 234 Kan. 1, Syl. ¶ 4, 668 P.2d 172 (1983). Discretion is abused only when no reasonable person would take the view adopted by the district court. The party asserting error bears the burden of showing such abuse of discretion. *State v. Martis*, 277 Kan. 267, 280, 83 P.3d 1216 (2004).

When seeking a temporary or preliminary injunction, a moving party must establish:

" '(1) there is a reasonable probability of irreparable future injury to the movant; (2) an action at law will not provide an adequate remedy; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) the injunction, if issued, would not be adverse to the public interest.' " *Empire Mfg. Co. v. Empire Candle, Inc.*, 273 Kan. 72, 86, 41 P.3d 798 (2002) (quoting *Sampel v. Balbernie*, 20 Kan. App. 2d 527, 530-31, 889 P.2d 804 [1995]).

The Whitsons take issue with only the first of these criteria, asserting the Board failed to meets its burden of demonstrating irreparable harm. They do not challenge the absence of an explicit district court finding on this point. See *State v. Combs*, 280 Kan. 45, 50, 118 P.3d 1259 (2005) (trial court presumed to have made all necessary findings to support its judgment).

In *General Building Contr.*, 275 Kan. at 542, this court worded this requirement a little differently, requiring the moving party to make " 'a showing that the movant will suffer irreparable injury unless the injunction issues.' " This wording places a higher burden on the moving party, demanding evidence that irreparable harm is a virtual certainty rather than a "reasonable probability." The distinction, though subtle, may be significant when an appellate court examines the case to determine whether an abuse of discretion occurred.

The *General Building Contractors* opinion took its wording of the irreparable harm requirement from the panel of our Court of Appeals that decided *Wichita Wire, Inc. v. Lenox*, 11 Kan. App.

2d 459, 462, 726 P.2d 287 (1986). The panel had borrowed the language from a 10th Circuit Court of Appeals case, *Lundgrin v. Claytor,* 619 F.2d 61, 63 (10th Cir. 1980), and it acknowledged that at that point, the standard had "never been expressly applied by Kansas state courts." 11 Kan. App. 2d at 462. The *Lundgrin* decision had further explained that its wording of the irreparable harm requirement meant there must be a "probable danger" of irreparable injury. See *Lundgrin,* 619 F.2d at 63 (quoting *Crowther v. Seaborg,* 415 F.2d 437, 439 [10th Cir.1969]). And the *Wichita Wire* panel, in its analysis, imported the same "probable danger" standard. 11 Kan. App. 2d at 462.

For reasons unknown, the qualification that a movant need show only a *probability* of irreparable injury was lost in the *General Building Contractors* opinion. We correct that now. *General Building Contractors* and any other Kansas case that has cited the *Wichita Wire* language to demand proof of the *certainty* of irreparable harm rather than the mere probability of it have set too high a standard for parties seeking injunctions. A "reasonable probability of irreparable future injury" or harm defines this one of the four evidentiary burdens placed on such a party.

The Whitsons argue that the County presented no evidence that residents could be harmed if Hendricks was allowed to stay at 24130 Golden Road. We disagree.

The Board presented evidence that Hendricks was a sexually violent predator. There was uncontroverted evidence that he was likely to reoffend if at large. Despite his reduced risk of reoffending because of his poor health and the structure and safeguards of the planned facility, the district judge implicitly determined that the Board had made a sufficient showing of probability of irreparable injury when he granted the injunction it sought. On this record, this was not an abuse of discretion.

### Applicability of K.S.A. 12-736

Our standard of review on a statutory question such as this is de novo. *Cooper v. Werholtz,* 277 Kan. 250, 252, 83 P.3d 1212 (2004). No deference is due an administrative agency's interpretation of a statute if it conflicts with legislative intent. *Chevron U.S.A. v. Nat-*

*ural Res. Def. Council*, 467 U.S. 837, 842-43, 81 L. Ed. 2d 694, 104 S. Ct. 2778 (1984); *Fisher v. Kansas Crime Victims Comp. Bd.*, 280 Kan. 601, 605, 124 P.3d 74 (2005); see also *Fieser v. Kansas Bd. of Healing Arts*, 281 Kan. 268, 130 P.3d 555 (2006).

The most fundamental rule of statutory interpretation and construction, to which all other rules are subordinate, is that the intent of the legislature governs if that intent can be ascertained. We must give effect to that intent, which the legislature is initially presumed to have expressed through the language it used. When a statute is plain and unambiguous, there is no need to resort to statutory construction. *Pieren-Abbott v. Kansas Dept of Revenue*, 279 Kan. 83, 88, 106 P.3d 492 (2005); *State v. Sodders*, 255 Kan. 79, Syl. ¶ 4, 872 P.2d 736 (1994). An appellate court merely interprets the language as it appears; it is not free to speculate and cannot read into the statute language not readily found there. *GT, Kansas, L.L.C. v. Riley County Register of Deeds*, 271 Kan. 311, 316, 22 P.3d 600 (2001).

If, on the other hand, a plain reading of the text of a statute yields an ambiguity or a lack of clarity, statutory construction becomes appropriate. In such circumstances, a court must move outside the text of the provision at issue and examine other evidence of legislative intent, such as legislative history, or employ additional canons of statutory construction to divine the legislature's meaning. *State v. Robinson*, 281 Kan. 538, 132 P.3d 934 (2006); *Board of Lincoln County Comm'rs v. Nielander*, 275 Kan. 257, 265, 62 P.3d 247 (2003).

K.S.A. 12-736 first explicitly sets forth the public policy behind its enactment, which predated the Act governing civil commitments of sexually violent predators by 6 years. See L. 1994, ch. 316, sec. 1 *et seq*; L. 1988, ch. 142, sec. 1. "[P]ersons with a disability shall not be excluded from the benefits of single family residential surroundings by any municipal zoning ordinance, resolution or regulation." K.S.A. 12-736(a).

This bill that eventually became the statute was introduced in 1986 on the heels of the United States Supreme Court's decision in *Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 87 L. Ed. 2d 313, 105 S. Ct. 3249 (1985). In that case, the operator of a

group home for mentally retarded adults challenged a zoning regulation excluding such homes from among the permitted uses in a residential area. The Court held that the regulation was not supported by any rational basis; rather, it appeared to rest on an irrational prejudice against the mentally retarded, which violated the Equal Protection Clause. *City of Cleburne*, 473 U.S. at 448-450.

To further the policy underlying the Kansas statute, subsection (e) of K.S.A. 12-736 prohibits municipalities such as Leavenworth County from excluding group homes for the disabled from areas zoned for single-family residences. It also prohibits municipalities from requiring special use permits for such homes if permits are not required for single-family residences with the same zoning classification. Any municipality provision to the contrary is "invalid." K.S.A. 12-736(e). Because Leavenworth County Zoning and Subdivision Regulations—even without the amendments made by Resolution 2005-31—require a special use permit for a group home when they do not require it for a single-family residence zoned "R" Rural District, we must decide whether the legislature intended K.S.A. 12-736(e) to apply when the residents of a group home for disabled individuals will be transitioning sexually violent predators.

The Whitsons argue that they applied for licensure of a "group home," that SRS issued a "group home" license within its authority, and that 24130 Golden Road qualifies as a "group home" under the statute. See K.S.A. 12-736(b)(1). They also argue that Hendricks is a person with both a physical and a mental "disability" within the meaning of the statute, see K.S.A. 12-736(b)(3), and that he is suitable for placement because he will not pose a danger to others, as long as he resides in the structured environment to be provided by the Whitsons.

The Board argues that K.S.A. 12-736 does not apply to the property at 24130 Golden Road because it is not a "group home" within the meaning of that statute; rather, it is a "Sexually Violent Predator Treatment Program Transitional Living Facility." The Board also argues that Hendricks was not intended to be protected under K.S.A. 12-736(c)(1) because, in addition to being physically disabled, he is mentally ill, a sexually violent predator, and a danger to others.

The statute defines a "group home" as

"any dwelling occupied by not more than 10 persons, including eight or fewer persons with a disability who need not be related by blood or marriage and not to exceed two staff residents who need not be related by blood or marriage to each other or to the residents of the home, which dwelling is licensed by a regulatory agency of this state." K.S.A. 12-736(b)(1).

The facility proposed by the Whitsons for 24130 Golden Road is licensed by SRS and is designed to hold eight or fewer persons with disabilities, as well as staff. Viewing it at a high level of generality, it is a "group home" as that phrase is defined by the plain language of the statute.

The statute defines "disability" as a "physical or mental impairment which substantially limits one or more of such person's major life activities"; "a record of having such an impairment"; or "being regarded as having such an impairment." K.S.A. 12-736(b)(3). There was certainly evidence in the record to support a finding that Hendricks qualifies as a person with a "disability" under the plain language of the statute. Again, we view the definition at a high level of generality.

Our inquiry does not end there, however. The facility proposed for 24130 Golden Road is not *only* a group home for Hendricks and other persons with one or more disabilities. It is, as the Board asserts, transitional living for persons who have been adjudicated sexually violent predators, persons deemed so dangerous to the general population of our state that the United States Supreme Court has held their indefinite civil commitment constitutional, as long as they are provided treatment for their mental abnormality while their freedom is restricted. The plain language of the statute does not address the peculiar circumstances of these individuals. Indeed, at the time the statute was enacted, there was no Sexually Violent Predator Act on the books to guide the legislature's deliberations. And the legislature has not seen fit to amend the statute to include specific provisions on group homes for transitioning sexually violent predators since the Act governing their commitment became law.

We are nevertheless able to discern the legislature's most likely intent regarding transitioning sexually violent predators from the

remaining text of the statute. Like the district court judge, we regard the plain language of subsection (c) as a clear manifestation of the legislature's attitude toward group homes for persons viewed as potentially harmful to their neighbors, *i.e.*, mentally ill persons who have not been evaluated to determine dangerousness, community corrections participants, parolees and probationers, and those in a state mental institution after a finding of mental disease or defect excluding criminal responsibility. See K.S.A. 12-736(c)(1) and (2). *Even if one of these persons also qualifies as a person with a disability as that term is defined by the statute,* he or she is ineligible for placement in a group home protected from housing discrimination by K.S.A. 12-736(e). In short, a municipality is free to completely exclude group homes for disabled persons with the additional characteristics set out in subsection (c) or to impose restrictions on them that cannot be imposed on group homes for the *merely* disabled.

We have no serious doubt that the legislature would treat group homes for disabled transitioning sexually violent predators in exactly the same way. As the district court judge noted, the legislature could not have been more clear about its desire to incapacitate sexually violent predators when it enacted the civil commitment process to which Hendricks has been subjected:

> "The legislature finds that there exists an extremely dangerous group of sexually violent predators who have a mental abnormality or personality disorder and who are likely to engage in repeat acts of sexual violence if not treated for their mental abnormality or personality disorder. Because the existing civil commitment procedures under K.S.A. 59-2901 *et seq.* and amendments thereto are inadequate to address the special needs of sexually violent predators and the risks they present to society, the legislature determines that a separate involuntary civil commitment process for the potentially long-term control, care and treatment of sexually violent predators is necessary. The legislature also determines that because of the nature of the mental abnormalities or personality disorders from which sexually violent predators suffer, and the dangers they present, it is necessary to house involuntarily committed sexually violent predators in an environment separate from persons involuntarily committed under K.S.A. 59-2901 *et seq.* and amendments thereto." K.S.A. 59-29a01.

Finally, we note our recognition of the dilemma facing SRS. It will no doubt be difficult to find a Kansas community willing to

permit the location of transitional housing for sexually violent predators within its territorial boundaries, even if the predators have physical disabilities that make them far less likely to reoffend. Yet SRS must arrange for such housing under the treatment program required by the United States Supreme Court to justify indefinite civil commitment of these predators based on their general propensity to be dangerous in the future. We trust that SRS will call the dilemma to the attention to the only branch of state government empowered and equipped to address it: the legislature.

### Constitutionality of Resolution 2005-31

We need not reach this issue because our careful review of the district court's order persuades us that the judge did not rely upon Resolution 2005-31 to grant the Board's injunction. We also do not rely upon it in affirming that decision. Counsel for the Whitsons conceded at oral argument before this court that, in such circumstances, consideration of this constitutional issue would be unnecessary to resolution of this action.

Affirmed.

ROSEN, J., concurring. I concur with the majority's conclusion that pre-existing Leavenworth County zoning regulations apply and affirm the district court's decision enforcing those regulations. My decision is based solely on the appellant's failure to obtain a special use permit as required by those zoning regulations and not on a finding of irreparable harm as required for injunctive relief. I write separately, not out of any compassion for the plight of sexually violent predators, but because of the absence of any evidence in the record that establishes a probability of irreparable injury to the movant if the injunction is denied.

The majority finds the "uncontroverted evidence that he is likely to reoffend if at large" sufficient to satisfy a probability of irreparable future injury to the movant; the first requirement that must be met when issuing an injunction. This finding is based primarily on an October 19, 2004, report from Larned State Hospital noting that after 10 years of treatment:

"Mr. Hendricks' mental abnormality cannot be said to have so changed as to fully eliminate his risk of re-offense, it does seem appropriate, given his reduced risk to re-offend based on his age and health concerns, that Mr. Hendricks should probably soon be considered for placement in an assisted living, nursing or other medical care setting which will meet his medical needs and allow him to demonstrate whether or not he can apply the concepts he has learned and the coping plans he has made to the complexities of real-life situations."

The conclusion that a reduced risk to reoffend is equivalent to "likely to re-offend if at large" is a strained interpretation that results in meeting the high standard required to grant injunctive relief. Further, the Phase 6 transition does not contemplate or suggest that Hendricks will be "at large" at any time. In fact, the placement provides for 24 hours a day, 7 days a week of supervision in which an observer is designated to be physically present or monitor Hendricks at all times. The facility sits on a remote 2 acre lot in rural Leavenworth County. There are alarms on all interior and exterior doors of the facility. Daily activities, such as food preparation, laundry, housekeeping, and hygiene are all supervised and monitored. Hendricks cannot go out onto the porch or patio of the premises without an escort. All television, reading materials, and mail are monitored and screened. There is no computer access.

In addition to these safeguards, Hendricks' physical condition, as mentioned in the majority opinion, leaves him almost nonambulatory. The record indicates he is now 71 years old and suffers multiple physical impairments. He has diabetes, poor circulation, poor eyesight, and poor hearing. He recently had a stroke and as a result has trouble walking and uses a walker or a cane. Hendricks cannot negotiate the 40-yard gravel driveway leading to and from the facility without falling. The risk of this patient becoming "at large" is almost nonexistent and certainly cannot satisfy a reasonable probability of future injury as required by law.

Given Hendricks' physical impairment, age, length of treatment and progression in a secure facility and the safeguards in place at the Phase 6 placement, a finding of irreparable injury under these facts essentially creates a legal impossibility of anyone ever being eligible for Phase 6 transitional care. As the majority points out, the United States Supreme Court upheld the constitutionality of

civil commitments under K.S.A. 59-29a01 *et seq.*, provided such commitments facilitate mental health treatment for those subject to them. See *Kansas v. Hendricks*, 521 U.S. 346, 138 L. Ed. 2d 501, 117 S. Ct. 2072 (1997). Foreclosing the possibility of transitioning out of a secure facility creates permanent confinement for those who fall under the Act. This clearly conflicts with the United States Supreme Court mandate that such placement must facilitate treatment and not merely be a means by which permanent detention is effectuated.

ALLEGRUCCI, J., joins the foregoing concurring opinion.