No. 128,762

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

RURAL WATER DISTRICT NO. 3, Douglas County,
*Appellant*,

v.

RURAL WATER DISTRICT NO. 8, Shawnee County,
RURAL WATER DISTRICT NO. 5, Osage County,
and
TRI-DISTRICT WATER AUTHORITY,
*Appellees*.

SYLLABUS BY THE COURT

1.

An injunction is a district court order directing a party to do or to refrain from doing a particular act.

2.

A temporary injunction preserves the relative positions of the parties in a lawsuit until a full decision on the merits can be made by the court.

3.

An appellate court reviews the grant of an injunction for an abuse of discretion. The party asserting that a temporary injunction was granted in error bears the burden to establish an abuse of discretion. A judicial action constitutes an abuse of discretion if (1) it is arbitrary, fanciful, or unreasonable; (2) it is based on an error of law; or (3) it is based on an error of fact.

4.

A party seeking injunctive relief must show:  (1) a substantial likelihood of success on the merits; (2) a reasonable probability of irreparable future injury to the movant; (3) an action at law will not provide an adequate remedy; (4) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause an opposing party; and (5) the injunction, if issued, would not be against public interest.

Appeal from Douglas District Court; CARL FOLSOM III, judge. Oral argument held November 18, 2025. Opinion filed January 16, 2026. Affirmed.

*Steven Massey Harris*, pro hac vice, of Doyle Harris Davis & Haughey, of Tulsa, Oklahoma, *Samuel A. Green*, of Fisher Patterson Sayler & Smith LLP, of Topeka, and *John W. Nitcher*, of Riling, Burkhead & Nitcher, Chtd., of Lawrence, for appellant.

*Christopher F. Burger* and *Bradley R. Finkeldei*, of Stevens & Brand, LLP, of Lawrence, for appellees Rural Water District No. 8 and Rural Water District No. 5.

No appearance by appellee Tri-District Water Authority.

Before GARDNER, P.J., HILL, J., and JOAN M. LOWDON, District Judge, assigned.

HILL, J.:  There are truths in life that are self-evident. One such truth is:  If a rural water district has no water to sell, then it must go out of business; after all, its customers aren't going to pay for air. Recognizing this truth, the district court here granted two defendants, both water districts, a temporary injunction barring the plaintiff—another water district—from turning off the water coming from the Tri-District Water Treatment Facility. Basically, the court ruled that the plaintiff could not turn off the tap while the three districts spar in court. The plaintiff, Rural Water District No. 3, Douglas County, which we will refer to as Douglas 3, appealed that injunction. We view this injunction as

an exercise of sound judgment by the district court, and we will not disturb the court's ruling.

*During litigation between three public water authorities, this appeal arises.*

This action began when Douglas 3 sought a declaratory judgment against two neighboring water districts—Rural Water District No. 8, Shawnee County, and Rural Water District No. 5, Osage County, which we will refer to as Shawnee 8 and Osage 5. In its petition, Douglas 3 requested a declaratory judgment regarding the rights of Douglas 3, Shawnee 8, and Osage 5 to the Tri-District Water Treatment Facility. Douglas 3 claimed it was the sole owner of the facility and asked that a declaratory judgment sever any rights that Shawnee 8 and Osage 5 have to the facility.

Douglas 3 also claimed a breach of contract, requesting the recovery of contractual debts owed by Shawnee 8 and Osage 5. Specifically, Douglas 3 alleged that Osage 5 failed to pay for contracted-for water, resulting in an outstanding debt to Douglas 3 in the sum of $282,429.08. It also claimed that shortfall will continue to increase as more water is supplied. Douglas 3 alleged the same failure to pay by Shawnee 8 with a shortfall of $403,814.83, and that shortage will continue to accrue. Douglas 3 asked the district court to enter judgment against both rural water districts and to award the alleged outstanding balances with interest as contract damages.

*One water treatment facility with three rural water districts needing water had led to several courtroom struggles.*

A brief history of the interactions of these three rural water districts provides a context for understanding the rulings of the district court and the reasons for the court's proper application of the extraordinary equitable relief of imposing a temporary injunction.

In 1979, Douglas 3 contracted with Shawnee 8 and Osage 5 for water from Clinton Lake reservoir. The contract provided that the parties would jointly construct a water treatment plant, referred to as the Tri-District Water Treatment Plant. The contract's term was set for 40 years, beginning June 1983, and provided an extension for another 40 years if requested by Shawnee 8 or agreed to by the parties.

In 2014, all three districts entered into an Interlocal Cooperation Agreement to create the Tri-District Water Authority, which concerned the ownership and management of the water treatment facility, now referred to as the Tri-District Facility. According to the Agreement, its purpose was to keep potable water flowing to all three districts by:

"(a) cooperating to operate, manage, maintain and continue to provide a joint public water supply utility to serve each Participant, and (b) to create a separate legal entity to conduct the joint and cooperative undertakings of managing, operating, maintaining and constructing a public water supply utility, all pursuant to the [Interlocal Cooperation] Act, [K.S.A. 12-2901 et seq.]."

The Agreement stated that the Authority would have the power to "acquire, construct, receive, own, manage, lease and sell real property, personal property, intangible property and other Water Supply Assets." The Authority also was given the power to "operate and maintain facilities," "enter into contracts," "sue and be sued," and "take and hold any property, real or personal, in fee simple or otherwise."

Under the Agreement's terms, "'Water Supply Assets'" were defined as the

"tangible and intangible assets usable in connection with providing water supply, including without limitation, real and personal property, physical facilities (e.g., intake facilities, water treatment plants, dams, wells, pump stations, reservoirs and other storage facilities, and transmission lines), water rights, water purchase contracts, capacity and/or contractual rights in facilities or resources owned by other entities. The Water Supply

4

Assets transferred to the Authority under this Agreement are identified on Exhibit A to this Agreement."

The Agreement also defined "'System'" as

"the Water Supply Assets and System owned and operated by the Authority, including particularly the assets and facilities described on Exhibit A currently owned and operated by [Douglas 3] and supplying water to [Douglas 3], [Shawnee 8] and [Osage 5] pursuant to various existing agreements among the Founding Participants."

We read this Agreement to mean that the parties expressed a willingness to cooperate and work together to the benefit of all of their water customers. This cooperation, though, has experienced some snags over time.

In a 2019 lawsuit, Shawnee 8 and Osage 5 alleged that Douglas 3 had locked them out of the Tri-District facilities. After an evidentiary hearing and an order denying Shawnee 8 and Osage 5's motion for a temporary injunction, the parties entered into a settlement agreement. The case was dismissed without prejudice in contemplation of the parties' settlement agreement.

The parties' agreed purpose for the Settlement Agreement quoted below is relevant to this lawsuit:

"The purpose of this Agreement is to engage the process described in the Interlocal Agreement regarding ownership and management of the Tri-District facilities and system, with the lnterlocal entity being the owner of the property, facilities and equipment of Tri-District, the legal entity in charge of the system for purposes of permitting water treatment and limited distribution, for the management of water production and distribution, the party with whom the Parties shall contract for further water supply, and the entity by which the water production shall continue."

5

The Settlement Agreement also expressly stated that Douglas 3 would "transfer all Tri-District real property assets and all rights to Tri-District facilities, fixtures and equipment to the Interlocal entity." Douglas 3 also agreed to assign its rights under the contract with the Kansas Water Office,

> "including its right of first refusal, to the lnterlocal entity to allow the lnterlocal to take over the raw water supply agreement. If other contracts can be assigned to the lnterlocal entity that necessarily relate to the management or operation of the plant, [Douglas 3] agrees to cooperate in any assignment or transfer, with costs thereof borne by the Interlocal entity."

Douglas 3 further agreed "transfer of all property, of whatever nature, will be free of any mortgage, security interest, lien or other claim of possession or ownership by any other party."

The parties also agreed to conduct Interlocal meetings, "or otherwise unanimously agree in a formal, written manner, that the method to transfer property or to construct facilities should be modified, that the same shall be allowed by this Settlement Agreement." Finally, the parties agreed to cooperate in extending the status quo and execute a contract that reflected the spirit and intent of their agreement.

After the Settlement Agreement was in place in 2021, the parties negotiated a formal contract in line with the intent set out in the Settlement Agreement. During this time, Douglas 3 renegotiated its Water Purchase Contract with the Kansas Water Office, a state agency, which permitted the withdrawal and use of up to 650 million gallons of water annually from the Clinton Lake reservoir. The contract terms were set for 20 years. The contract expressly acknowledged the existing water agreements with Osage 5 and Shawnee 8. Article 6(d) codified these agreements, acknowledging that a portion of the total water withdrawn from the reservoir would be reserved in the amounts of 350 million gallons for Shawnee 8 and 100 million gallons for Osage 5. The Water Purchase Contract

further provided that the failure of Shawnee 8 and Osage 5 to renew a water agreement with Douglas 3 would result in the reduction in the amount of water both rural water districts would be able to receive.

The Water Purchase Contract also recognized the parties' settlement and creation of the Tri-District Water Authority:

> "The parties acknowledge that [Douglas 3], along with [Shawnee 8] and [Osage 5], have created the Tri-District Water Authority, by way of an Interlocal Cooperation Agreement Creating the Tri-District Water Authority approved by the Attorney General of the State of Kansas on or about October 16, 2014. This entity was created to manage the Tri-District water facility and other related property, *but implementation was delayed. The parties are now prepared to engage the Tri-District Water Authority to treat water for distribution to the individual water districts,* but additional time will be necessary to obtain the transfer of property and permits to the Tri-District Water Authority. *The parties acknowledge that the Tri-District Water Authority intends to continue the same purpose of use and place of use of the water as* [*Douglas 3*]*, merely under the Tri-District Water Authority*. This is provided for notice of the intentions of [Douglas 3] and the other Districts, and any assignment grant will be determined at the time the same is proposed by these parties." (Emphases added.)

As negotiations continued toward a formal contract, the parties signed two extension agreements, allowing an additional six months with each extension of the expiration date for the parties to complete their contractual relationship. But negotiations between the districts broke down.

To sum up what was accomplished, we note that three rural water districts came together to form a three-district authority to build, develop, and manage a water treatment facility that would supply potable water to the districts for the benefit of their customers.

7

*When the talking stopped, one district took action.*

At this point, Douglas 3 returned to its prior claim from the 2019 litigation that it was the sole owner of the Tri-District Facility and extended offers to Shawnee 8 and Osage 5 effectuating Douglas 3's claim of ownership. The most recent offer by Douglas 3 was that Shawnee 8 and Osage 5 could continue receiving water from the Tri-District Facility for one year, priced at the market rate of $6.60 per 1,000 gallons, with rates subject to change with 90 days' notice before terminating all rights within one year. Douglas 3 also began to refuse participation in Authority meetings. The most recent offer does not include language reserving or preserving any claims or issues between the parties.

The Authority continued meeting and issued its rate adjustments for the variable rate increase from $3.33 per thousand gallons to $3.50 per thousand gallons, plus the payment of fixed costs in the same amounts as the prior year. The Authority calculated the rate using Douglas 3's methodology and formulas, with Douglas 3's financial statements and budget. Comparing the two rates—Douglas 3's most recent offer and the Authority's calculated rate—the average monthly bill for Shawnee 8 would increase from about $72,000 to $112,000 under Douglas 3's proposed rates. Douglas 3 claimed that its proposed rate was reasonable based on a comparison of other districts, contending the rate was the "market rate." Douglas 3 did not support the proposed rate with any budget or formula that took into consideration the three districts' financial conditions or infrastructure.

Based on the impending expiration date of the parties' last extension, Shawnee 8 and Osage 5 moved for a temporary injunction to prevent Douglas 3 from terminating the flow of water from the Tri-District Facility to the districts. Attached to the motion for a temporary injunction were several exhibits, including two affidavits from the general managers of each respective water district, the district court order from the 2019 case, the

Settlement Agreement, the 2014 Interlocal Agreement and 2015 Management Agreement, transcripts from the evidentiary hearing on a temporary injunction motion in the 2019 case, and the Water Purchase Contract between Douglas 3 and the Kansas Water Office.

Douglas 3 opposed the motion, and the issue was litigated at an evidentiary hearing where testimony and evidence was presented by all parties. All three rural water districts' general managers testified about the relationships between the three districts and each district's individual needs and burdens.

After considering the evidence and testimony at the temporary injunction hearing, the district court granted the temporary injunction. In its order, the court made several findings of fact and conclusions of law. The court found that each factor for determining whether to grant a temporary injunction had been met.

*A review of the law of injunctions is helpful at this point.*

An injunction is a district court order directing a party to do or to refrain from doing a particular act. K.S.A. 60-901. Under the statute, an order granting a temporary injunction "may be the final judgment in an action, and it may also be allowed as a provisional remedy." K.S.A. 60-901. A temporary injunction preserves the relative positions of the parties until a full decision on the merits can be made. *Steffes v. City of Lawrence*, 284 Kan. 380, 394, 160 P.3d 843 (2007).

In turn, we review the grant of an injunction for an abuse of discretion. *Downtown Bar and Grill v. State*, 294 Kan. 188, 191, 273 P.3d 709 (2012). The party asserting that the injunction was granted in error bears the burden to establish an abuse of discretion. A judicial action constitutes an abuse of discretion if (1) it is arbitrary, fanciful, or unreasonable; (2) it is based on an error of law; or (3) it is based on an error of fact. *In re A.S.*, 319 Kan. 396, 400, 555 P.3d 732 (2024).

Fundamentally, to obtain injunctive relief, a movant must show:

(1) a substantial likelihood of success on the merits;

(2) a reasonable probability of irreparable future injury to the movant;

(3) that an action at law will not provide an adequate remedy;

(4) that the threatened injury to the movant outweighs whatever damage the proposed injunction may cause an opposing party; and

(5) that the injunction, if issued, would not be against public interest. *Hodes & Nauser, MDs v. Schmidt*, 309 Kan. 610, 619, 440 P.3d 461 (2019).

*The district court mentioned several factors that influenced its decision granting the temporary injunction.*

First, the district court found that Shawnee 8 and Osage 5 had a substantial likelihood of success regarding their right to receive water from the Tri-District facilities because those rights stemmed from the parties' common ownership of the facilities. The court also found they had a substantial likelihood of success regarding the terms and conditions under which the water would be supplied to the parties. The court reasoned that this was because of the long-established history of the parties operating under similar terms.

In response to Douglas 3's argument that the court lacked the authority to compel Douglas 3 to enter a contract regarding ownership, water supply, and terms and conditions, the district court found that there was already a history of agreements on those points by Douglas 3. This was evidenced by Douglas 3's petition to enforce the Settlement Agreement, thereby acknowledging its responsibility to agree to extensions to effectuate the spirit and intent of the agreement.

10

The court also determined that using its "power to extend" would be the simplest solution, and Douglas 3's ownership contention was contradicted by the Settlement Agreement, past agreements between the parties, the Tri-District financials, and the prior court order. Therefore, the court determined that the status quo would be maintained by a temporary injunction.

On the second factor, the district court found a reasonable probability that Shawnee 8 and Osage 5 would suffer irreparable injury should Douglas 3 terminate the water supplied by the Tri-District Facility. The court found that Shawnee 8 would not be able to adequately serve a significant number of patrons, including a high school. The court also determined that about 175 meters in Osage 5 would not have water or would not have adequate water pressure, making the water unsafe for drinking. The court thus found that the failure to provide adequate water to patrons was an irreparable harm to the district and its patrons.

The district court also determined that Douglas 3's offer to cure Osage 5's injury by serving the patrons who lose access to water was inadequate. The court questioned the offer's permissibility under state law and found a strong likelihood that such a change would require notice and an opportunity to be heard by the water-district patrons. The court relied upon the holding in *Dedeke v. Rural Water Dist. No. 5*, 229 Kan. 242, 249, 623 P.2d 1324 (1981). The court also found the proposed cure would likely divest Osage 5 of its territory, thus implicating constitutional rights, and would amount to providing water with no contract, guarantee of service, or accountability from Douglas 3.

Third, the district court found that Shawnee 8 and Osage 5 had no adequate remedy at law and could not protect themselves from irreparable harm with an extension of their agreement for 40 years. Because that agreement would lack a resolution of Shawnee 8 and Osage 5's claims, the agreement unnecessarily opened the districts to a

11

loss of their rights and a lessening of the value of their claims. The court thus found Shawnee 8 and Osage 5 lacked any adequate remedy at law.

Fourth, the district court found the irreparable harm threatened by the termination of the flow of water outweighed Douglas 3's proposed injury if the injunction were granted. The court determined that the only injury alleged by Douglas 3 was monetary and could be remedied by repayment of any amount owed.

And finally, the district court determined that there was a "clear public benefit in assuring, through the injunction, that the patrons of Shawnee 8 and Osage 5 continue to get safe and adequate water."

The district court determined, based on the evidence, testimony, and consideration of the legal factors necessary for a temporary injunction, that a temporary injunction would best maintain the status quo until a final determination in the litigation could be made. Accordingly, the court crafted its order to ensure the continued flow of water, money, and information to the parties. Specifically, the court ordered:

- the continued supply of potable water at the existing points of delivery, as required by Shawnee 8 and Osage 5;
- the supply of water at a fixed and variable rate determined by the existing Authority formula as set forth in Exhibit 75, to be paid by Shawnee 8 and Osage 5 according to contract and past practice; and
- Douglas 3 to provide all financial information and production data for Shawnee 8 and Osage 5 to monitor continued compliance with regulatory requirements, draw water from Clinton Lake to satisfy minimum requirements, "and such other information so as to determine amounts paid and water used by each entity," including Douglas 3.

12

Finally, the district court waived the bond requirement under K.S.A. 60-905(b), reasoning that the parties are quasi-municipal entities and, therefore, "public bodies with sufficient funds to pay for any possible damage that would be incurred by [Douglas 3], if wrongfully enjoined, and because the damages that would allegedly be incurred as a result of the injunction are substantially the same as those being made in this litigation."

The basic question before us is whether the temporary injunction should continue while this litigation continues. Douglas 3 contends that the injunction is an improper mandate forcing them to sell water to the other two rural water districts; that is, the order actually forces Douglas 3 to make a contract with Shawnee 8 and Osage 5. On the other side, Shawnee 8 and Osage 5 contend the temporary injunction simply maintains the status quo while this lawsuit is resolved and should continue.

*This temporary injunction is not an abuse of discretion.*

The district court made its findings and reasoning clear in its well-drafted order. The court concluded that the parties' common ownership of the facilities was evidenced by the contracts and customs by the parties for 40 years. The terms and conditions that all three parties operated under were materially the same over the course of the contractual relationships. The court also determined that the rates that were established by the Tri-District Water Authority were reasonable and appropriate as they used Douglas 3's financial statements and budget.

A prior panel of this court discussed the standard for determining whether a movant demonstrated a substantial likelihood to succeed on the merits. That panel found that the movant must show that more likely than not—at least a 51 percent chance—it would succeed on the merits. *State ex rel. Kobach v. Harper*, 65 Kan. App. 2d 680, 701, 571 P.3d 6, *rev. denied* 321 Kan. ___ (2025). We follow the *Harper* panel's reasoning here.

13

In its conclusion under this factor, the district court relied on the historical relationship between the parties for 40 years, operating under materially the same terms and conditions for the sale and flow of water. Based on the parties' history and evidence supporting Shawnee 8 and Osage 5's claims that the Tri-District Facility is jointly owned by all three districts, the district court concluded that Shawnee 8 and Osage 5 were substantially likely to succeed on the merits. We agree because it appears from this record that it is more likely than not that the defendant districts will prevail on this claim.

Further, the evidence was sufficient to conclude that there was a substantial likelihood that all three rural water districts jointly owned the Tri-District Facility. Language found in the Interlocal Agreement, the Kansas Water Office contract, and the Settlement Agreement show all three rural water districts' intent to vest the Tri-District Authority with the ownership and management of the Tri-District Facility. Thus, we conclude that the district court's finding that Shawnee 8 and Osage 5 demonstrated a substantial likelihood of success on the merits was reasonable and supported by sufficient evidence.

*The district court's fear that Shawnee 8 and Osage 5 would suffer irreparable harm if a temporary injunction was not granted is reasonable.*

Courts have consistently required that, when seeking a temporary injunction, a movant must demonstrate that a reasonable probability of injury exists, a burden lower than the burden of proof at trial. See *Idbeis v. Wichita Surgical Specialists*, 285 Kan. 485, 492, 173 P.3d 642 (2007); *Steffes*, 284 Kan. at 395. But the harm may not be speculative or a mere possibility. See *Board of Leavenworth County Comm'rs v. Whitson*, 281 Kan. 678, 684, 132 P.3d 920 (2006).

The district court here reasonably concluded that, should Douglas 3 terminate the water being supplied from the Tri-District Facility, there was a reasonable probability that

14

Shawnee 8 and Osage 5 would suffer irreparable injury. The evidence established that, without the flow of water from the Facility, Shawnee 8 would be unable to adequately serve a significant number of patrons. Due to an equipment failure, Shawnee 8 would not be able to access its backup supply of water, and there was testimony that the equipment would not be replaced before the date that Douglas 3 threatened to terminate the water supply. Similarly, Osage 5 would suffer irreparable harm as it would be unable to adequately provide water or adequate water pressure to about 175 meters.

In addition to the harm of depriving patrons of adequate water, if Douglas 3 closed the supply of water to Shawnee 8 and Osage 5, it would expose the other two rural water districts to losing their rights to access the water at the Clinton Lake reservoir. And should the other two rural water districts extend an agreement with Douglas 3, such an extension may be considered a waiver if the agreement did not provide a reservation of Shawnee 8 and Osage 5's claims.

Our review leads us to conclude that the district court had sufficient evidence to support its conclusion that, without an injunction—and thus allowing Douglas 3 to terminate the flow of water—there was a reasonable probability that Shawnee 8 and Osage 5 would suffer irreparable harm.

*Shawnee 8 and Osage 5 had no adequate remedy at law to prevent the imminent and irreparable harm.*

Like the irreparable harm discussed above, Shawnee 8 and Osage 5 had no adequate remedy at law to prevent the harm if Douglas 3 terminated the flow of water. Should Shawnee 8 and Osage 5 choose to extend the agreements that have existed for 40 years without a reservation of their claims, the two rural water districts unnecessarily open themselves to losing their rights and waiving their claims. And should they allow the existing extension to expire, by not accessing the water from the Clinton Lake

reservoir, they would be unnecessarily exposing themselves to losing those rights—either to the State or be abandoned by the Tri-District Authority for lack of use. Finally, under the contract between Douglas 3 and the Kansas Water Office, the terms provide that, should Shawnee 8 or Osage 5 fail to renew an agreement with Douglas 3, their right to access the contract quantity of water may be reduced.

From this discussion, we see that Shawnee 8 and Osage 5 would be forced to choose between forfeiting their claims and rights to the ownership of the Tri-District Facility or forfeiting their rights to the water in the Clinton Lake reservoir. This evidence thus supports the district court's finding that Shawnee 8 and Osage 5 had no adequate remedy at law to prevent the irreparable harm.

*The possible harm to Shawnee 8 and Osage 5 outweighed any possible injury to Douglas 3 as a result of a temporary injunction.*

The district court concluded that Shawnee 8 and Osage 5's imminent harm was the loss of water for a significant number of patrons, should Douglas 3 terminate the flow of water, coupled with the loss of water rights or future rights and claims for Shawnee 8 and Osage 5. The court found this imminent harm outweighed the possible injury to Douglas 3 by entering an injunction.

After all, Douglas 3's only alleged injury would be the possible monetary loss in rates lower than it asserts Shawnee 8 and Osage 5 should be paying for the water produced by the Tri-District Facility. Thus, the claim of alleged underpayment is outweighed by the loss in water to the rural water districts' patrons and the loss in rights and claims. Any possible issue with the district court's grant of the injunction can be remedied by repayment of the amount Douglas 3 asserts is due. The district court properly weighed in balance the possible harms to both sides.

16

The irreparable harm that would be suffered by Shawnee 8 and Osage 5 outweighs the possible injury to Douglas 3 by an injunction. The district court's finding under this factor was reasonable and supported by sufficient evidence.

*It was in the public interest to grant an injunction.*

Finally, sufficient evidence supports the district court's finding that an injunction serves the public interest. There is a clear benefit in patrons having safe and adequate water as well as those patrons retaining their water rights through their local rural water districts.

*Granting the temporary injunction was not an abuse of discretion.*

The temporary injunction here maintained the status quo by ensuring Shawnee 8 and Osage 5 continued to have access to adequate and safe water for its patrons while this litigation proceeds. There was sufficient evidence to support the district court's findings that:

- Shawnee 8 and Osage 5 demonstrated a substantial likelihood of success on the merits;
- Shawnee 8 and Osage 5 faced a reasonable probability of imminent and irreparable harm;
- Shawnee 8 and Osage 5's irreparable harm outweighed the possible monetary injury to Douglas 3 by entering the injunction;
- Shawnee 8 and Osage 5 had no adequate remedy at law; and
- The public interest was supported by entering the temporary injunction.

We find no legal or equitable reason to set aside or modify the temporary injunction issued by the district court here.

*We find no error in the court waiving the bond requirement.*

For its second issue, Douglas 3 contends that the district court abused its discretion by waiving the bond requirement under K.S.A. 60-905(b) for temporary injunctions.

Under K.S.A. 60-905(b):

> "Unless otherwise provided by statute or this section, no temporary injunction shall operate unless the party obtaining the same shall given an undertaking with one or more sufficient sureties in an amount fixed and approved by the judge of the court, securing to the party injured the damages such injured party may sustain including attorney fees if it be finally determined that the injunction should not have been granted."

Under the statute, the State and its agencies are exempted from this requirement, and the district court is provided the discretion to waive the requirement to place a surety bond if an injunction is granted. K.S.A. 60-905(b).

*What are the facts that are salient to this issue?*

The district court waived the injunction-bond requirement under K.S.A. 60-905(b) because the parties are "public bodies with sufficient funds to pay for any possible damage that would be incurred by [Douglas 3], if wrongfully enjoined, and because the damages that would allegedly be incurred as a result of the injunction are substantially the same as those being made in this litigation."

We agree with the district court. All three of these parties are public water authorities similar to state agencies. They aren't going to run off out of the state. Their service territories are well established, and they produce ample revenue to cover any possible contract damage award. We see no abuse of discretion by the district court in waiving the injunction bond requirement.

Affirmed.